In re Jardy and Eulalia JONES, Debtors.

Steve H. MAZER, Trustee, Plaintiff,

v.

Jardy S. JONES, Eulalia A. Jones, Derek E. Jones, Eric E. Jones, Jolene L. Jones and Jardy S. Jones and Eulalia S. Jones, as guardians for Sharlene N. Jones, Defendants.

Bankruptcy No. 7–92–13609MF.
Adv. No. 94–1065M.

United States Bankruptcy Court,
D. New Mexico.

June 28, 1995.

---

Steve H. Mazer, Trustee, Albuquerque, NM.

Robert M. Janes, Albuquerque, NM, for the children.

Daniel J. Behles, Albuquerque, NM, for debtors.

## MEMORANDUM OPINION

MARK B. McFEELEY, Bankruptcy Judge.

This matter is before the Court upon the trustee's Complaint to Set Aside Fraudulent Transfer, brought pursuant to the New Mexico Fraudulent Transfer Act, § 56–10–14 et seq., N.M.S.A.1978 (1994 Supp.) ("FTA"). The court has jurisdiction over this case pursuant to 11 U.S.C. § 544. This is a core proceeding. 25 U.S.C. § 157. The parties have agreed that the Court should decide the merits upon stipulated evidence and testimony presented by deposition. In doing so, the Court has weighed the evidence and assessed the credibility of witnesses, and has treated as legal argument the pending motions for summary judgment filed by the trustee and the debtors.[1] The Court has considered the evidence and argument and holds that the trustee's complaint is well taken and the transfer of the subject property may be avoided by the trustee.

### Facts

The property in question is the Hummingbird Trailer Park ("trailer park") in Farmington, San Juan County, New Mexico. The trustee alleges that the debtors had a beneficial interest in the trailer park which they transferred to their children by quitclaim deed in 1991 in order to avoid the effect of a judgment entered against them in the New Mexico state district court. The debtors deny that they owned the property at the time of the alleged transfer. The relevant facts are as follows.

Jardy and Eulalia Jones, the debtors, have four children: Derek, born February 15, 1965; Eric, born November 3, 1968; Jolene, born February 17, 1975; and Sharlene, born September 11, 1976 ("children").

In 1968, Jardy Jones received a bachelor's degree in business from the University of New Mexico and in 1992 obtained a teaching certificate. He has owned and worked in small businesses.

In June, 1975, Guy Jones, the father of Jardy Jones, died, leaving a will containing bequests of $2,000 to each grandchild living at the time of his death, $2,000 to Eulalia Jones, and to Jardy Jones the sum of $5,000 and a one-half interest in the fixtures and building of Jones Mercantile. The will was never filed for probate.

On July 23, 1975 the debtors, as purchasers, entered into a real estate contract ("contract") for the purchase ("purchase") of the trailer park for $175,000 from Giles and Ruby Durbin ("Durbin"). The debtors made a down payment of $30,000 and thereafter have made monthly payments of $1,000 on the balance at an annual interest rate of 7½%, as called for by the contract. As of September, 1991 the balance owed was approximately $108,000. At all material times, payments have been kept current. The contract was recorded in San Juan County on July 24, 1975. The escrow agent for the contract is the First National Bank of Farmington ("bank").

Jardee, Inc. was a Nevada corporation formed by the debtors. The 1977 annual report filed with the State of New Mexico stated that the corporate purpose was "retail merchandising, etc." and that Jardy Jones was president, Eulalia Jones was Vice–President and Derek Jones was Secretary–Treasurer. The corporation issued stock certificates to Derek, Eric and Jolene on August 1, 1975 and to Sharlene on December 1, 1983. The corporation does not appear as a purchaser on the contract and there has been no assignment of the purchaser's interest to the corporation. On July 8th, 1982, the corpora-

---

1. The Court has previously denied cross-motions for summary judgment, filed by the children and the trustee.

tion granted a utility easement to the Gas Company of New Mexico over the trailer park property. Jardy Jones stopped using the corporation to conduct business and it is no longer in good standing. The bank account presently used for the trailer park's operations is that formerly used by the corporation.

Jardy Jones has managed the trailer park since its purchase. The children have not participated in its management and have provided no services or otherwise participated in its operations. Jardy Jones has controlled the trailer park's bank account, out of which he has had made payments on the contract and paid expenses. Family members have received disbursements from the proceeds. Throughout the escrow, the bank has used Eulalia Jones' social security number to report to the I.R.S. the interest paid under the contract. In tax years 1987, 1988, 1989 and 1990 the debtors claimed income and deductions in connection with the trailer park on their personal tax returns, including deductions for depreciation based on the 1975 purchase price and for interest in amounts identical to those reported by the bank to the I.R.S. The debtors have not provided to the children any K-1 reports, written accountings, or regular oral accountings. None of the children has reported income or deductions from the trailer park on a tax return, nor listed an interest in the trailer park as an asset on a financial statement when given the opportunity.

On or about January 10, 1986, Giles Durbin, a seller under the contract, sent a letter to Jardy Jones giving him permission to assign the contract to the debtors' son, Derek, when he became twenty-one years of age.

February 15, 1986 was Derek's twenty-first birthday. The debtors executed an assignment, dated February 15, 1986 ("assignment") to Derek of their interest in the real estate contract and Derek signed the acceptance.

On November 3, 1989 the debtors executed an assignment of the real estate contract to Derek, Eric, Jolene and Sharlene. Eric never signed the acceptance and that assignment was never recorded.

In 1990, the debtors filed a civil proceeding in the First Judicial District Court of New Mexico against Eloy Padilla, Tadjin Gillani and others ("state court proceeding") arising from debtors' purchase of a video store. The defendants filed a counterclaim against the debtors.

On September 6, 1991, the jury in the state court proceeding announced its verdict in favor of Padilla and Gillani on their counterclaim.

On September 12, 1991, the children were added as authorized signatories on the Hummingbird Trailer Park account at the First National Bank of Farmington.

On September 17, 1991 the debtors executed and recorded a quitclaim deed ("quitclaim deed") by which they deeded their interest in the trailer park to Derek, Eric, Jolene and Sharlene.

On September 21, 1991, the state court entered partial judgment for compensatory damages against the debtors for Gillani in the amount of $47,500.00 and for Padilla in the amount of $12,333.00. On October 7, 1991, Gillani and Padilla recorded a transcript of judgment in San Juan County in the amount of $59,833 plus interest at a rate of 15% per annum.

In October, 1991, Jolene and Sharlene signed the acceptance of the assignment dated November 3, 1989.

On February 5, 1992 the state court entered its final judgment awarding attorneys fees to Gillani of $22,351.33 and to Padilla of $27,404.37. A second transcript of judgment for these amounts, plus interest, was recorded in San Juan County on March 5, 1992.

On April 22, 1992, Derek recorded, in San Juan County, the assignment to him dated February 15, 1986.

None of the children paid money or transferred property to the debtors in exchange for the assignment or quitclaim deed.

On August 28, 1992, Gillani filed an action in San Juan County to set aside the quitclaim deed and the recording of the assignment. That action is pending.

On October 13, 1992, the debtors, pro se, filed their Chapter 7 petition ("petition").

Their amended schedule shows assets of $46,808 and liabilities of $313,070. No interest in the trailer park is reflected in the debtors' schedules and statements. The debtors did not disclose in their response to Question 14 of the statement of financial affairs that Jardy Jones controlled the trailer park and its bank account, and did not report income from the trailer park within two years of filing.

On February 12, 1993, at the continued § 341 meeting, Jardy Jones provided to the trustee a Statement of Facts about the trailer park.

On May 14, 1993, the debtors were granted a discharge in bankruptcy.

On March 7, 1994, the trustee filed this adversary complaint against the debtors and the children (referred to collectively as "defendants").

## Discussion

The trustee brings this action under the FTA pursuant to the avoidance powers conferred under 11 U.S.C. § 544.[2] § 56–10–15D NMSA 1978 (1994 Supp.) The FTA allows a creditor to set aside a fraudulent transfer of the debtor's assets. § 56–10–21A. The trustee contends that the recording of the quitclaim deed in 1991 was a fraudulent transfer. He alleges in pertinent part that the debtors were the beneficial owners of the trailer park and that they transferred the property in 1991 with actual intent to hinder, delay or defraud a creditor. The defendants assert that the debtors have never owned the trailer park. In the alternative, they claim that any transfer occurred on February 15, 1986, when the debtors executed the assignment to Derek. They also raise defenses based on the statute of limitations.

### Asset

■ The FTA prohibits the fraudulent transfer of an "asset" of a debtor. An "asset" is anything that may be the subject of

ownership by a debtor. §§ 56–10–15B, 56–10–15J NMSA 1978 (1994 Supp.). A purchaser's interest in a real estate contract may be an asset subject to the FTA. § 56–10–20A(1) NMSA 1978 (1994 Supp.). It is uncontroverted that the debtors were the purchasers under the contract. As such, *prima facie* they had equitable title to the trailer park. *See Marks v. City of Tucumcari*, 93 N.M. 4, 595 P.2d 1199 (1979) (vendee under real estate contract treated as owner of land and holds an interest in real estate). The children claim, however, that the debtors held the trailer park in trust for the children as an investment. While it is uncontroverted that there is no written instrument creating an express trust, *see Aragon v. Rio Costilla Livestock Association*, 112 N.M. 152, 155, 812 P.2d 1300, 1303 (1991) (express trust is created by written or spoken words expressing intention to create a trust), the defendants claim that the facts support imposition of a constructive or resulting trust.

■ A resulting trust is an inference made by law from circumstances and the nature of the transaction between the parties that the party holding title to property was not intended to have a beneficial interest in it. *Schmitz v. Smentowski*, 109 N.M. 386, 393, 785 P.2d 726, 733 (1990). A showing of intent is not required to establish a resulting trust, but the proponent must prove the absence of an intent for the transferee to have a beneficial interest in the property. *Aragon*, 112 N.M. at 154, 812 P.2d at 1302. A constructive trust arises if the person who holds title is subject to an equitable duty to convey it to another to prevent unjust enrichment. *Bassett v. Bassett*, 110 N.M. 559, 566, 798 P.2d 160, 167 (1990). A writing is not required for either a resulting or a constructive trust. *Id.*, 110 N.M. at 562, 798 P.2d at 163. The evidence required to establish an oral trust must be strong, cogent and convincing. *Id.* at 563, 798 P.2d at 164. A constructive trust must be proved by clear

---

**2.** Section 544(b) reads: The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

Section 544 permits the trustee to exercise whatever rights of avoidance any creditor holding an unsecured allowable claim could have exercised on his own behalf under applicable state or federal law. *Collier on Bankruptcy* § 544.01 p. 544–3 (15th Ed.)

and convincing evidence *Matter of Estate of McKim*, 111 N.M. 517, 519, 807 P.2d 215, 217 (1991). The court finds that the defendants have failed to prove that the debtors do not have a beneficial interest in the trailer park or that the principle of unjust enrichment is applicable here.

■ The children rely on their father's statements that the trailer park is "theirs" because shortly before their grandfather's death he gave $24,000—$8,000 for each grandchild then living—to Jardy Jones to invest on their behalf. Jardy Jones states in his affidavit that this money, plus $6,000 from other sources, was used to finance the down payment on the trailer park. Additionally, under the terms of their grandfather's will, each grandchild living at the time of his death (in 1975) was to receive $2,000 and Jardy Jones testified that some of this money also was used for the trailer park. Sharlene, who was born the following year, relies on her father's statements for her claim that the debtors used their own funds to buy her an interest in the trailer park equal to her siblings.'

The defendants have failed to prove any of the transactions allegedly funding the trust. The timing of the purchase suggests that some of the purchase money could have come from Guy Jones' estate, but there was no probate administration to document the bequests. There is no evidence permitting the Court to trace the alleged gifts from Guy Jones prior to death to the claimed acquisition of the trailer park. The proof offered by the debtors to prove a gift to Sharlene in 1982 are checks, bearing no special notation, paid by them to a plumbing and heating company. The only written evidence supporting defendants' trust claim is a letter to the debtors dated June 30, 1975 from the real estate broker involved in the purchase stating "I realize that you are making the investment in the trailer park for your children with their money . . .," which alone is insufficient to establish the source of the down payment. Furthermore, Jardy Jones'

inability to recall any meaningful details about the alleged transactions does not advance defendants' claim.

Subsequently, although the debtors did maintain a separate bank account for the trailer park, it is not a trust account. They did not file fiduciary tax returns and have never rendered to the alleged beneficiaries a separate accounting of its operations. The only reporting of profits and losses for the trailer park's operations appears on the debtors' personal tax returns, and the defendants have produced no bank records to demonstrate from whom and to whom payments were made through the operating account. While each child alleges a one-fourth share of the trust, the children have not shared proportionately in the proceeds and neither the children nor the debtors could account to any reasonable degree about the amounts, timing, or recipients of any distributions of trust benefits. Further, the proceeds were not used exclusively for the children's benefit. The debtors directly enjoyed a beneficial interest in the trailer park by claiming income and deductions on their individual tax returns.

The defendants suggest that the one-time existence of the corporation, in which the children were shareholders, is evidence that they intended to segregate the trailer park from their assets. Again, the evidence is insufficient to support their claim. On the one hand, it appears that the corporation existed from 1977 to 1980 and that some of the trailer park's business was conducted in the corporate name.[3] On the other, Jardy Jones stated that the corporation was created to hold the trailer park as an asset but the debtors never assigned the contract to the corporation and the corporate purpose stated on the 1977 corporate report is "retail merchandising, etc." During the corporation's apparent existence, interest deductions on the contract were reported by the bank to the I.R.S. under Eulalia Jones' social security number. In any event, the corporation was short-lived and Jardy Jones admitted that he

---

**3.** Letter of November 20, 1980 from Jardy Jones as president of the corporation to tenants of the trailer park acting on behalf of the Board of Directors demanding timely payment of rent.

Check # 1285 of Jardee, Inc. to the San Juan County Treasurer for $274.90, allegedly for payment of property taxes on the trailer park.

384

stopped using the corporate form of business since "the paperwork and tax rules for corporations were too complicated" for him. (Jardy Jones Affidavit par. 8).[4]

The Court recognizes that the children were minors at the time of purchase and the proceeds from the trailer park have been used for their benefit, but these facts do not compel the Court to find the existence of a trust. While consistent with a trust theory, these facts are no less consistent with the exercise of debtors' parental duties apart from any trust relationship. Given the debtors' failure to segregate the trailer park from their assets at any material time or to trace the monies that allegedly fund the trust, there is no factual basis on which the Court can conclude that a trust should be imposed. Any intent the debtors may have had to segregate this asset was not given legal effect. In summary, the Court finds that the debtors acquired equitable title to the trailer park at the time of purchase and concludes that it was their "asset" at the time of any purported transfer.

*Transfer*

■■■ Alternatively, the defendants argue that the assignment dated February 15, 1986 transferred to Derek any interest the debtors may have had in the trailer park and, therefore, the trustee's complaint is time-barred. § 56–10–23 NMSA 1978 (1994 Supp.). The trustee's position is that their interest was not transferred until the quitclaim deed was recorded in 1991.

A "transfer" means:

every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance; .. § 56–10–16L NMSA 1978 (1994 Supp.).

A quitclaim deed is a conveyance of title, *Birtrong v. Coronado Building Corp.*, 90 N.M. 670, 672, 568 P.2d 196, 198 (1977), and therefore is a "transfer" under the FTA.

Section 56–10–20 of the FTA provides that a transfer is made:

(1) with respect to an asset that is real property other than a fixture but including the interest of a seller or purchaser under a contract for the sale of the asset, when the transfer is so far perfected that a good-faith purchaser of the asset from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee; ... § 56–10–20A(1)..

Jardy Jones testified that the Durbins orally consented to the assignment to Derek and the defendants cite the letter of January 10, 1986 as further proof of consent. They argue that the Durbins' consent operated to perfect the assignment because thereafter the Durbins could not have consented to another assignment.

■■■ This argument must fail for two reasons. First, it incorrectly assumes that the Durbins necessarily would disclose to a subsequent transferee that they had consented to a prior assignment. Second and more importantly, it ignores the statutory requirement that the transfer must be "so far perfected" that a good-faith purchaser could not take an interest in the subject real property superior to that of the transferee. The "applicable law" is New Mexico law, *In re Veretto*, 131 B.R. 732 (Bkrtcy.D.N.M.1991) (construing substantially similar definition of "transfer" in 11 U.S.C. § 547(e)(1)(A)), which requires that an instrument affecting title to real property be recorded. § 14–9–1 NMSA 1978 (1994 Supp.). An unrecorded instrument does not affect the rights of a bona fide purchaser or judgment lien creditor, without knowledge of the existence of such an unrecorded instrument. § 14–9–3 NMSA 1978 (1994 Supp.). New Mexico law is clear; it is upon recordation that a transfer of an interest in real property is perfected. *Veretto*, 131 B.R. at 737. The manifest purpose of the perfection requirement in this instance is to prevent a fraudulent transfer from becoming impregnable to attack by keeping it se-

---

4. The account number of the current operating account is that formerly used by the corporation. The current account bears no corporate identifi- cation and the signatories, as shown on the signature card, sign in their individual capacity only.

cret until the limitation period has lapsed. *See Collier on Bankruptcy*, § 548.08 p. 97 (15th Ed.) (discussing substantially similar language in § 548(d)(1) of the Code).

 An executory real estate contract is a writing concerning the sale of land and therefore is subject to the recording act. *See* §§ 14–9–1, 14–9–3 NMSA 1978 (1994 Supp.) The contract requires the owner's consent to be countersigned on the contract,[5] which contemplates that the completed assignment will be recorded. Given the policies underlying New Mexico's recording act, which the Court must consider in applying the provisions of the FTA, *see Dona Ana Savings and Loan Association v. Dofflemeyer*, 115 N.M. 590, 593, 855 P.2d 1054, 1057 (1993) (the FTA is meant to be construed "in conjunction with the general body of the law as a whole"), the Court rejects defendants' argument that a seller's verbal consent to an assignment of an interest in a real estate contract is a substitute for perfection of that interest by recording.

From the time of purchase in 1975 until the recording of the quitclaim deed in 1991, the duly recorded judgment lien of any creditor without knowledge of the unrecorded assignment would have prevailed over any interest held by Derek pursuant to the assignment. That creditor would have been entitled to the protections of the recording statute. *See Ruybalid v. Segura*, 107 N.M. 660, 665, 763 P.2d 369, 374 (Ct.App.1988) (recording of judgment lien precluded reformation of deed to detriment of rights of judgment lien creditor). The assignment to Derek remained a secret lien and did not effect a "transfer" to him until April, 1992, when it was recorded. By then, the quitclaim deed to the children and the transcripts of judgment filed by Gillani and Padilla were of record.

Furthermore, the evidence is unconvincing that the debtors intended to divest themselves of their equitable interest in the trailer park in 1986. Their use of the property has remained basically unchanged after that date. The fact that they have continued to claim income and deductions on their individual tax returns and to exercise financial control over the trailer park defeats defendants' claim that the debtors intended to transferred their interest upon executing the assignment. *See Den–Gar Enterprises v. Romero*, 94 N.M. 425, 428, 611 P.2d 1119 (Ct.App.1980) *cert. den.* 94 N.M. 628, 614 P.2d 545 (1990) (deed not legally delivered, even though physically delivered, absent evidence of present intent on part of grantor to divest himself of title and part with control of land).

For the foregoing reasons, the Court finds that the debtors owned the trailer park when the quitclaim deed was recorded on September 19, 1991 and its recording was the first "transfer" of the debtors' interest for purposes of the FTA. The Court further finds that the 1992 recording of the assignment was also a "transfer" subject to the FTA.

*Fraud*

 The FTA allows a creditor to set aside transfers resulting from both actual fraud (fraud in fact) and constructive fraud (fraud in law). Subsection A of § 56–10–18 pertains to actual fraud and provides in pertinent part:

A. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay or defraud any creditor of the debtor; ..

Whether a transfer is fraudulent is a question of fact. *Watson v. Watson*, 221 Conn. 698, 607 A.2d 383, 387 (1992). The intent required to establish actual fraud may be established by circumstantial evidence, or by inferences drawn from a course of conduct. *Farmers Co–Operative Association v. Strunk*, 671 F.2d 391, 395 (10th Cir.1982). The requisite intent may be demonstrated by proof of the existence of any one or more of the factors enumerated in subsection B:

---

5. Paragraph 11 of the contract provides: "It is further understood and agreed that no assignment of this contract shall be valid unless the same be endorsed hereon and countersigned by the Owner.

B. In determining actual intent under Paragraph (1) of subsection A of this section, consideration may be given to whether:

(1) a transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor has been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

The enumeration of these factors is non-inclusive. *Dona Ana Savings and Loan Association,* 115 N.M. at 593, 855 P.2d at 1057. Although proof of one or more of these "badges of fraud" does not create a presumption that the transfer was fraudulent, UFTA § 4 Comment (5) U.L.A. at 654, proof of several badges may afford a basis to infer fraud. *Johnson v. Dowell,* 592 So.2d 1194 (Fla.App.1992). *See In re Davenport,* 147 B.R. 172, 184 (Bkrtcy.E.D.Mo.1991) (presumption of fraud raised under Missouri law where debtor transferred substantial portion of property to sons, for no consideration,

during pendency of lawsuit, retained control of portion of property, and transfer probably rendered him insolvent). The trustee alleges that several of these factors are applicable in the instant case. Proof of fraud in New Mexico is by clear and convincing evidence. *First National Bank in Albuquerque v. Abraham,* 97 N.M. 288, 292, 639 P.2d 575, 579 (1982). The Court has weighed the evidence and finds that the trustee has met his burden as to actual fraud. Accordingly, the Court need not consider the constructive fraud provisions of the FTA.[6]

■■■■ *Transfer to insider.* As close relatives of the debtors, the children are "insiders" as defined under § 56–10–15 of the FTA.[7] Transfers to closely related persons are given increased scrutiny. Comment (5) to § 4 of UFTA. Evidence of a blood relationship between a transferor and transferee may be of importance when coupled with other circumstances tending to show fraud. *Texas Sand Co. v. Shield,* 381 S.W.2d 48, 53 (Tex.1964).

■■■■ *Effect of Gillani lawsuit.* The quitclaim deed was recorded eleven days after the jury verdict in the state court proceeding and four days before the entry of the partial judgment for compensatory damages. Within this same period, the children became signatories on the trailer park bank account. The following month, the daughters signed the 1989 assignment. Jardy Jones testified that the judgment was a motivating factor in the execution and recording of the quitclaim deed, to make it "perfectly clear that we didn't own that trailer park." (Deposition of Jardy Jones, p. 33). Within three months of entry of the final judgment, Derek, at his father's suggestion, recorded the assignment in the context of "all these proceedings that have been going on." (Deposition, Derek Jones, pp. 23–24.)

Interfamilial transfers made in connection with litigation are suspect. The court in *U.S. v. Romano,* 757 F.Supp. 1331 (M.D.Fla.1989), *aff'd.* 918 F.2d 182 (11th Cir.1990), considering facts similar to those in the instant case,

---

**6.** § 56–10–18(A)(2).

**7.** G. "Insider" includes: (1) if the debtor is an individual: (a) a relative of the debtor ..." A

"relative means an individual related by consanguinity within the third degree as determined by the common law ..."

set aside a transfer from mother to son made ten months after the United States had filed suit against the son's parents to enforce tax liens. Noting that "when a debtor transfers property after being sued, an indication of fraud results that the debtor must rebut," *Romano*, 757 F.Supp. at 1337, the court was unconvinced by debtors' largely testimonial evidence that the mother held the property in trust for the son, given evidence that the parents had exercised dominion and control over the property. None of the trust transactions were documented. The court found that three badges of fraud—exercise of control, transfer to an insider, and the timing of the conveyance—demonstrated the existence of fraud. *See also In re Knapp*, 146 B.R. 294 (M.D.Fla.1992) (judgment debtor's transfer of shares to wife while debtor insolvent shortly after entry of judgment held fraudulent); *People ex rel. Hartigan v. Anderson*, 232 Ill.App.3d 273, 173 Ill.Dec. 852, 597 N.E.2d 826 (1992) (debtor's conveyance to estranged spouse fraudulent where conveyance made after receiving grand jury subpoena for Medicaid fraud and twenty days before indictment); *Perrott v. Frankie*, 605 So.2d 118 (Fla.App.1992) (transfer of asset from father to daughter during pendency of litigation against father held fraudulent).

Jardy Jones indicated that he did not understand that the recording date determines the date of transfer, nevertheless he both executed *and recorded* the quitclaim deed on the same date in September of 1991. This was not the case with the assignment to Derek, which remained unrecorded as long as the debtors enjoyed continued tax benefits from the operation of the trailer park, but was recorded two and one-half months after entry of the final judgment. The recording, in 1992, of the hitherto-unrecorded assignment is also evidence that the debtors engaged in a continuing series of transactions designed to thwart the interests of their judgment creditors. Given the sequence of events and Mr. Jones' business experience and educational background, the Court concludes that the debtors made the transfer by quitclaim deed for the primary purpose of avoiding the effect of the impending judgment in the state court proceeding, and that the subsequent recording of the assignment was in furtherance of that scheme.

*Retention of control.* After 1991, the debtors continued to operate the trailer park as they also had done after executing the 1986 assignment to Derek. The bank continued to report interest deductions on the contract to the I.R.S. in the debtors' names, having received no contrary instructions from the debtors. The debtors remained signatories on the bank account and Jardy Jones continued to run operations. The evidence is uncontroverted that the children, as adults, have remained uninvolved in the management of the park and have assumed no managerial or financial control over its operations. Retention of control, together with other factors, is evidence of fraud. *See Romano*, 757 F.Supp. at 1336 (conveyance of real property to debtors' son held fraudulent where they retained control over property, they received greater value from property than monthly payments to son provided, and transfer was made after debtors were sued); *In re Blitstein*, 105 B.R. 133, 136 (Bkrtcy.S.D.Fla. 1989) (transfer of real property to family member without consideration under circumstances where debtor retained portion of premises are badges of fraud).

*Concealment of asset.* In a separate adversary proceeding, this Court has held that the debtors' failure to disclose the transactions about the trailer park in the schedules and statements filed with this Court did not constitute fraud for purposes of denial of discharge; however, the Court may consider these omissions as evidence of actual fraud under the FTA. The Code did not require the debtors to report the 1991 transfer in their statements and schedules because it occurred more than one year before the petition was filed. 11 U.S.C. § 547. However, the debtors also failed to disclose, as they should have, that they had reported income from the trailer park on their 1990 tax return, which was within two years of filing the petition; that they are purchasers and make payments under the contract; and that they control the operations and management of the trailer park, including the bank account. Taken together with the omission of the 1992 recording of the assignment, which does fall

within the Code's one-year fraudulent transfer period, these omissions constitute additional proof of fraudulent intent.

*Transfer of substantially all debtors' assets.* A review of the debtors' available tax returns shows a diminution of rental-producing assets and taxable income from 1987 to 1990. No tax returns were available for 1991. The 1987 Schedule E shows three income-producing properties while the comparable 1990 schedule shows only the trailer park. The debtors' bankruptcy schedules and statements, filed in 1992, reflect no further assets and their 1992 tax return reports only modest income, from wages and interest. Accordingly, the Court finds that a transfer of the debtors' interest in the trailer park was a transfer of substantially all of their assets.

*Reasonably equivalent value.* Given the purchase price of the trailer park in 1975, the income from its operations shown in the debtors' tax returns shortly before the transfer, and the reduction in principal owed on the contract from $145,000 to some $108,000 in September, 1991, the Court finds that the trailer park had value. Under the FTA, a transferee gives value for an asset received if, in exchange, property is transferred or an antecedent debt is satisfied. § 56–19–17A. It is uncontroverted that the children exchanged no property as consideration for the transfers and, absent any accounting, there has been no showing of the existence of an antecedent debt. Therefore, the children did not give value. Transfer of an asset to a family member without consideration is evidence of fraud. *See Blitstein,* 105 B.R. at 136; *Texas Sand Co.,* 381 S.W.2d at 53.

For the foregoing reasons, the Court finds that the debtors made the transfers with actual intent to hinder, delay or defraud the judgment creditors, and the trustee is entitled to avoid the transfers effected by the 1991 quitclaim deed and the 1992 recording of the assignment. § 56–10–21A(1) NMSA 1978 (1994 Supp.)

*Children's burden of proof.*

A transfer made with actual intent to defraud is not voidable under the FTA against a person who took in good faith and for a reasonably equivalent value. § 56–10–22A. The children bear the burden of proof under this section. *See In re Agricultural Research and Technology Group, Inc.,* 916 F.2d 528 (9th Cir.1990) (transferee bore burden of proving good faith under substantially similar Hawaii law). As previously discussed, it is uncontroverted that the children exchanged nothing of value for the transfers. Nor have they shown good-faith. The Court infers from the evidence that the children had reason to know about the Gillani lawsuit and its implications. The family is close-knit. Derek's testimony indicates that he knew about the litigation prior to recording the assignment in 1992. All the children signed the signature card within days of the jury verdict. The daughters, while living at home, signed the acceptance of the 1989 assignment one month after the entry of judgment. Therefore, the Court concludes that the children have failed to meet their burden of proof and the transfers are voidable.

*Statute of Limitations*

The statute of limitations for claims brought pursuant to § 56–10–18A of the FTA is four years. § 56–10–23A NMSA 1978 (1994 Supp.) Both transfers fall within the applicable limitations period. The debtors raise as a defense the one-year statute of limitations set forth in § 56–10–23C. That section pertains to claims brought under § 56–10–19B to avoid transfers to insiders for antecedent debt. The Court having found for the trustee on his claim of actual fraud, the one-year statute of limitations is inapplicable.

*Conclusion*

For the reasons set forth above, the trustee may avoid the debtors' transfer of their interest in the trailer park to their children by the 1991 quitclaim deed and the 1992 recording of the assignment, and the relevant documents may be reformed accordingly. An appropriate judgment shall enter. To the extent that any issues raised in the pending motions for summary judgment are not addressed in this opinion, those motions are denied. This opinion constitutes the

Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## JUDGMENT

In accordance with the memorandum opinion entered herewith, it is hereby ordered that:

1. The trustee may avoid the transfer effected by the quitclaim deed dated September 17, 1991 from Jardy S. Jones and Eulalia A. Jones, husband and wife, to Derek E. Jones, Eric E. Jones, Jolene L. Jones and Sharlene N. Jones and filed for record in San Juan County, New Mexico on September 17, 1991 at Book 1136, page 240.

2. The trustee may avoid the transfer effected by the assignment, dated February 15, 1986 and filed for record in San Juan County, New Mexico on April 22, 1992 at Book 1143 page 616, to Derek E. Jones of the real estate contract dated July 23, 1975 by and between Giles M. Durbin, Ruby Durbin, Joseph Durbin and Dolores Durbin, as sellers, and Jardy S. Jones and Eulalia S. Jones, as purchasers, filed for record in San Juan County on July 24, 1975, at Book 753, page 110.

3. The trustee may reform all documents regarding the subject real property to show Jardy S. Jones and Eulalia A. Jones to be the true owners thereof.

4. The subject real property is the property of the bankruptcy estate.