[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action brought by the plaintiffs claiming that five (5) promissory notes executed by five limited partnerships are presently in default and due and owing to the plaintiffs. This action has also been brought to foreclose upon the limited partnership interests that secure each such note. Plaintiffs also claim that the defendants made certain fraudulent transfers while such indebtedness existed and want those transfers voided and the transferred funds returned to the limited partnerships. Plaintiffs further seek access to the books and records of the defendant limited partnerships.
Trial was held on three days in September, 2000 and one day in October, 2000. Briefs were filed on January 25, 2001, reply briefs on CT Page 4234 February 8, 2001 and surrebuttal briefs on March 26, 2001.
Based upon the totality of the evidence, the Court finds the following:
1. At all times relevant hereto, Michael and Doris Konover have been residents of the State of Connecticut.
2. At all times relevant hereto, Robert Patron ("Patron") has been a resident of the State of Florida. Patron is the assignee of the interest in the notes formerly held by Marcia Patron. Since the commencement of this action, Patron assigned his interests in the notes to 7301 Venture Holding, L.L.C. (hereinafter "Venture") which is owned by Patron. Venture was substituted as a party plaintiff in this action without objection, and Venture continues to hold the interests in the notes formerly held by Patron.
3. At all times relevant hereto, defendant Mohegan Village Limited Partnership (hereinafter "Mohegan Village LP") has been a limited partnership organized and existing under the laws of the State of Connecticut.
4. At all times relevant hereto, defendant Mohegan Park Limited Partnership (hereinafter "Mohegan Park LP") has been a limited partnership organized and existing under the laws of the State of Connecticut.
5. At all times relevant hereto, defendant Moosup Gardens Limited Partnership (hereinafter "Moosup Gardens LP") has been a limited partnership organized and existing under the laws of the State of Connecticut.
6. At all times relevant hereto, defendant Windham Heights I Limited Partnership (hereinafter "Windham Heights I LP") has been a limited partnership organized and existing under the laws of the State of Connecticut.
7. At all times relevant hereto, Windham Heights II Limited Partnership (hereinafter "Windham Heights II LP") has been a limited partnership organized and existing under the laws of the State of Connecticut.
8. Each Limited Partnership owned income producing real estate hereinafter also known as the "project" or "projects".
9. At all times relevant hereto, defendants S.K. Residential Corp., and TIG-RFA, Inc., were general partners, and New England Investments CT Page 4235 Associates 1982 Limited Partnership (NEIA 1982) was a limited partner in each of the aforementioned limited partnerships. Also at all relevant times, the following were limited partners in said limited partnerships: Marvin Patron, succeeded by The Estate of Marvin Patron, succeeded by Marcia Patron, succeeded by Robert Patron, succeeded by 7301 Venture Holding L.L.C. which presently holds said limited partnership interests which were originally owned by Marvin Patron. (See defendants' Exhibit G).
10. On November 29, 1982, Mohegan Village LP executed a Purchase Money Promissory Note in the principal amount of $364,000.00, payable to the order of Mohegan Village Associates with interest at the rate of 13.25% per annum (hereinafter the "Mohegan Village Note").
11. Doris Konover and Venture (the successor of Robert Patron) are the holders of the Mohegan Village Note with each holding a fifty (50%) interest in the Note.
12. On November 29, 1982, Mohegan Park LP executed a Purchase Money Promissory Note in the principal amount of $495,900.00, payable to the order of Mohegan Park Associates with interest at the rate of 13.25% per annum (hereinafter the "Mohegan Park Note").
13. Doris and Michael Konover and Venture are the holders of the Mohegan Park Note with the Konovers holding a seventy-five (75%) interest in the Note, and Venture holding a twenty-five (25%) interest in the Note.
14. On November 29, 1982, Moosup Gardens LP executed a Purchase Money Promissory Note in the principal amount of $591,900.00, payable to the order of Moosup Garden Associates with interest at the rate of 13.25% per annum (hereinafter the "Moosup Gardens Note").
15. Doris Konover and Venture are the holders of the Moosup Gardens Note with each holding a fifty (50%) interest in the Note.
16. On November 29, 1982, Windham Heights I Limited Partnership executed a Purchase Money Promissory Note in the principal amount of $341,500.00, payable to the order of Windham Heights Associates I with interest at the rate of 13.25% per annum (hereinafter the "Windham Heights I Note).
17. Doris and Michael Konover and Venture are the holders of the Windham Heights I Note with the Konovers holding a seventy-five (75%) interest in the Note, and Venture holding a twenty-five (25%) interest in the Note. CT Page 4236
18. On November 29, 1982, Windham Heights II Limited Partnership executed a Purchase Money Promissory Note in the principal amount of $74,000.00, payable to the order of Windham Heights II Associates with interest at the rate of 13.25% per annum (hereinafter the "Windham Heights II Note").
19. Doris Konover and Venture are the holders of the Windham Heights II Village Note with Doris Konover holding a seventy-five (75%) interest in the Note, and Venture holding a twenty-five (25%) interest in the Note.
20. The terms of each of the Mohegan Village Note, Mohegan Park Note, Moosup Gardens Note, Windham Heights I Note, and Windham Heights II Note (hereinafter jointly referred to as the "Notes") provide that payment of the entire balance of principal and accrued and unpaid interest shall be due and payable on the earlier to occur of (a) fifteen years from the date of each such Note or (b) the sale of, or refinancing of a mortgage on, certain real property owned by the maker. Said notes also provide that no payment of principal or interest shall be made except from surplus cash; and if principal or interest is not paid when due, the payee's sole remedy shall be to proceed under the Assignment and Security Agreement.
21. Each of Mohegan Village LP, Mohegan Park LP, Moosup Gardens LP, Windham Heights I LP, and Windham Heights II LP (hereinafter jointly referred to as the "five limited partnerships") failed to make any payments to the plaintiffs on said notes notwithstanding demand for same.
22. By Conditional Assignment and Security Agreement, dated November 29, 1982 (hereinafter the "Mohegan Village Assignment"), defendants S.K. Residential Corp., TIG-RFA, Inc., and New England Investments Associates 1982 Limited Partnership, or their predecessors, conditionally transferred, assigned, conveyed and granted to Mohegan Village Associates all of their right, title and interest in and to their partnership interests in Mohegan Village LP, including, but not limited to, all rights they may have to profits, cash flow and distributions in connection with such interests.
23. By Conditional Assignment and Security Agreement, dated November 29, 1982 (hereinafter the "Mohegan Park Assignment"), defendants S.K. Residential Corp., TIG-RFA, Inc., and New England Investments Associates 1982 Limited Partnership, or their predecessors, conditionally transferred, assigned, conveyed and granted to Mohegan Park Associates all of their right, title, and interest in and to their partnership interests in Mohegan Park LP, including, but not limited to, all rights they may have to profits, cash flow and distributions in connection with CT Page 4237 such interests.
24. By Conditional Assignment and Security Agreement, dated November 29, 1982 (hereinafter the "Moosup Gardens Assignment"), defendants S.K. Residential Corp., TIG-RFA, Inc., and New England Investments Associates 1982 Limited Partnership, or their predecessors, conditionally transferred, assigned, conveyed and granted to Moosup Gardens Associates all of their right, title, and interest in and to their partnership interests in Moosup Gardens LP, including, but not limited to, all rights they may have to profits, cash flow and distributions in connection with such interests.
25. By Conditional Assignment and Security Agreement, dated November 29, 1982 (hereinafter the "Windham Heights I Assignment"), defendants S.K. Residential Corp., TIG-RFA, Inc., and New England Investments Associates 1982 Limited Partnership, or their predecessors, conditionally transferred, assigned, conveyed and granted to Windham Heights I Associates all of their right, title, and interest in and to their partnership interests in Windham Heights I LP, including, but not limited to, all rights they may have to profits, cash flow and distributions in connection with such interests.
26. By Conditional Assignment and Security Agreement, dated November 29, 1982 (hereinafter the "Windham Heights II Assignment"), defendants S.K. Residential Corp., TIG-RFA, Inc., and New England Investments Associates 1982 Limited Partnership, or their predecessors, conditionally transferred, assigned, conveyed and granted to Windham Heights II Associates all of their right, title, and interest in and to their partnership interests in Windham Heights II LP, including, but not limited to, all rights they may have to profits, cash flow and distributions in connection with such interests.
27. The terms of the Mohegan Village Assignment, the Mohegan Park Assignment, the Moosup Gardens Assignment, the Windham Heights I Assignment, and the Windham Heights II Assignment further provided that, in the event of the default in payment of the notes, the plaintiffs are entitled to reimbursement for any and all fees, costs and expense, including, but not limited to, reasonable attorneys' fees, incurred incident to the enforcement or foreclosure of their security interests.
28. The defendants notified the limited partnerships of the notice of default and demand, which had been provided by the plaintiffs.
29. Pursuant to Section 2(d) of the Assignments, the plaintiffs are entitled to enforce or foreclose the security interests created by the Assignment in the event of default. CT Page 4238
30. On October 10, 1996, Mohegan Village LP transferred $40,364.00 to its partner, New England Investment Associates 1982 Limited Partnership.
31. On June 9, 1997, Mohegan Park LP transferred the sum of $4,580.06 to its partner, New England Investments Associates 1982 Limited Partnership.
32. On October 10, 1996, Mohegan Park LP transferred $12,612.00 to its partner, New England Investments Associates 1982 Limited Partnership.
33. On June 9, 1997, Mohegan Park LP transferred the sum of $4,108.00 to its partner, New England Investments Associates 1982 Limited Partnership.
34. On October 10, 1996, Moosup Gardens LP transferred $27,017.00 to its partner, New England Investments Associates 1982 Limited Partnership.
35. On October 10, 1996, Windham Heights I LP transferred $12,938.00 to its partner, New England Investments Associates 1982 Limited Partnership.
36. On June 9, 1997, Windham Heights I LP transferred the sum of $6,551.87 to its partner, New England Investments Associates 1982 Limited Partnership.
37. On October 10, 1996, Windham Heights II LP transferred $37,938 to its partner, New England Investments Associates 1982 Limited Partnership.
38. On June 9, 1997, Windham Heights II LP transferred the sum of $81,031.35 to its partner, New England Investments Associates 1982 Limited Partnerships.
39. As for the transfers described in the preceding nine paragraphs, each Limited Partnerships transferred to each of the other partners (SK Residential Corp., TIG-RFA, Inc., and Estate of Marvin Patron) an amount equal to that partner's proportionate interest in the total distribution.
40. As of January 25, 2001, the balance on the Mohegan Village Note is $364,600.00 of principal, $724,642.50 of interest through maturity and $152,6043.97 of post-maturity interest.
41. As of January 25, 2001, the balance on the Mohegan Park Note is CT Page 4239 $495,900.00 of principal and $985,601.25 of interest through maturity and $207,561.22 of post maturity interest.
42. As of January 25, 2001, the balance on the Moosup Gardens Note is $591,900.00 of principal and $1,176,401.25 of interest through maturity and $247,724.57 of post maturity interest.
43. As of January 25, 2001, the balance on the Windham Heights I Note is $341,500.00 of principal and $678,731.25 of interest through maturity and $142,936.37 of post maturity interest.
44. As of January 25, 2001, the balance on the Windham Heights II Note is $74,000.00 of principal and $147,075.00 of interest through maturity and $30,973.04 of post maturity interest.
45. While the defendants have denied that the Notes are due, they have not disputed the respective Notes' principal and accrued interest for a total accrual of $7,735,587 as of January 25, 2001.
46. The plaintiffs also claim that payments were made out of surplus cash which, in fact, should have been made to the plaintiffs or their predecessors.
47. Plaintiffs also claim that some of the payments made by the defendants were fraudulent transfers in derogation of the plaintiffs' rights.
All of these matters will be addressed hereafter, and further findings of facts will also be set forth hereafter.
As a preliminary matter, the Court does not find the documents ambiguous. "It is well settled law that in construing a contract a court must ascertain the intent of the parties as such intent has been expressed by the language employed in the agreement." Champagne v.Champagne, 43 Conn. App. 84, 848 (1996). "The construction and interpretation of the agreement necessarily depend upon the intent of the parties as manifested by the language of the agreement". Barnard v.Barnard, 214 Conn. 99, 110 (1990). "Where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." Regency Savings Bank v.Westmark Partners, 59 Conn. App. 160, 163 (2000).
 DEFENDANTS' SPECIAL DEFENSES
1. THE FIRST SPECIAL DEFENSE FILED BY THE DEFENDANTS ON AUGUST 6, 1999 ISTHAT THE PLAINTIFFS' ACTION IS BARRED BY THE DOCTRINES OF EQUITABLECT Page 4240ESTOPPEL AND UNCLEAN HANDS.
The gravamen of the defendants' claim is as follows: Pursuant to the Real Estate Purchase and Sales Agreement of August 27, 1982, a sale of each housing project was consummated on November 29, 1982 in which each project was sold by the original payees of the aforementioned five promissory notes to the various limited partnerships which presently own each project. For example, Mohegan Village Associates was a general partnership (the general partners of which were Simon Konover and Marvin Patron) which sold the Mohegan Village Project to the Mohegan Village Limited Partnership. Simon Konover and TIG-RFA, Inc., became general partners of the Mohegan Village Limited Partnership as well as general partners of the remaining limited partnerships. Simon Konover and TIG-RFA, Inc., as general partners of each limited partnership and Marvin Patron and NEIA 1982 as limited partners thereof conditionally assigned interests in each limited partnership to the payees of each note, i.e. Mohegan Village Associates (a general partnership the partners of which were Simon Konover and Marvin Patron) as security for the purchase money promissory notes that were given by each limited partnership to the payees' partnerships. See plaintiffs Exhibit 12 as an example of a
Conditional Assignment of Partnership Interest. Defendants claim that as general partners of each limited partnership Simon Konover and Marvin Patron owed to each of the other partners of the limited partnerships a fiduciary duty to deal fairly with them and to act in the best interests of the limited partnership. Defendants also claim that Simon Konover and Marvin Patron were general partners of the selling partnerships which sold the projects to the defendants, and said Simon Konover became one of the general partners and Marvin Patron a limited partner in the local limited partnerships which purchased the properties; that they, therefore, had a conflict of interest in that they were not only general/limited partners of each limited partnership that became obligors under the Conditional Assignment of Partnership Interest, but were also general partners of the secured party in each conditional assignment such as Windham Heights Associates II. In other words, Marvin Patron and Simon Konover were limited/general partners of the obligor and general partners of the obligee under each Conditional Assignment of Partnership Interest. Defendants claim the limited partners of the limited partnerships were induced to invest in said limited partnerships by the actions of Simon Konover and Marvin Patron.
The doctrine of equitable estoppel has two criteria. First, "the party must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief"; second, "the other party, influenced thereby, must actually change his position or do some act to his injury which he otherwise would CT Page 4241 not have done". Spear-Newman, Inc., v. Modern Floors Corp.,149 Conn. 88, 91 (1961). As stated in Boyce v. Allstate Ins. Co.,236 Conn. 375, 383-84 (1996) "[e]quitable estoppel has its roots in equity and stems from `the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed . . . as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worst'". Defendants also claim that because of this fiduciary relationship and conflict of interest that Simon Konover and Marvin Patron cannot foreclose either on their own interests or those of their limited partners. Further, they claim that Robert Patron (Marvin Patron's son) is a successor in interest to Marvin Patron as holder of the notes and that Michael and Doris Konover, the assignees of Simon Konover's interests in the notes, are the son and wife of Simon Konover. Because they were relatives of the original partners, they, too, are precluded by the principles of equitable estoppel from foreclosing on the interests of the limited partners; that the plaintiffs stand in the same position as Marvin Patron and Simon Konover did.
It is true that the Private Placement Memorandum disclosed the fact that Marvin Patron and Simon Konover were general partners of the selling partnerships and specifically acknowledged that "the general partners of the partnership and of the local limited partnerships have a fiduciary duty and obligation to the partnership, the local limited partnerships and the investors which requires that they exercise good faith and integrity in resolving any conflicts of interest." (Plaintiffs Exhibit 13)
The Court, based upon the totality of the evidence, finds the following:
1. The burden of proof to establish the special defenses is that of the defendants.
2. There is essential agreement upon the two elements that must be proven to support a claim of equitable estoppel. The first is that the party against whom estoppel is claimed, in this case the plaintiffs, must do or say something calculated or intended to induce another party, the limited partnership investors in this case, to believe that certain facts exist and to act on that belief. Under the holding in SKW Real EstateL.P. v. Mitsubishi Motor Sales of American, Inc., 56 Conn. App. 1, 8
(1999), the conduct in question must be misleading.[1]
3. Plaintiffs claim defendants offered no evidence at trial to support their allegations. However, the defendants do point to plaintiffs Exhibit 13 which is the Private Placement Memorandum. The Court must decide the disputes in this case based upon facts or based upon inferences CT Page 4242 reasonably drawn from the evidence. Morningside Ass'n v. MorningsideDevelopment Inc., 172 Conn. 60, 64 (1976). The only evidence on this issue before the Court are the exhibits. There was no relevant testimony regarding these allegations. A review of plaintiffs' Exhibit 13 reveals that the defendants were fully informed of the consequences of their investments. On page 1, the Private Placement Memorandum (hereinafter "PPM") states in pertinent part:
"Each investor will be required to represent that he is familiar with and understands the terms of the offering . . .". Page 29 of the PPM refers to "FIDUCIARY RESPONSIBILITY OF GENERAL PARTNERS". As pointed out by the defendants, a general partner is accountable to a limited partnership as a fiduciary and consequently must exercise good faith and integrity in handling partnership affairs; and there is no liability on the part of the general partner for any act or omission performed or omitted by him in good faith. The only way in which the general partner could be liable is for fraud, wilful misconduct, gross negligence or any breach of his fiduciary duty as general partner. This section in its entirety gives fair warning to the defendants that they would have a very difficult burden in holding the general partners liable for damages resulting from a breach of a fiduciary relationship.
4. Further, paragraph 6 on page 33 of the PPM makes clear that each of the purchase money notes taken by the sellers is due on the earlier of the date of the sale or refinancing of the project or 15 years from the date of transfer of the project to the local limited partnership. It further states that each purchase money note is secured by an assignment of the partnership's interest in the local limited partnership and that the partnership interests in the local limited partnership may be foreclosed. Section III, paragraph 1 points out the potential of conflicts of interest. The investors are all notified that the sellers of the projects, including Marvin Patron and Simon Konover, have been given substantial interests in the acquiring local limited partnerships and non-recourse purchase money notes. It further states, inter-alia: "In addition, the interest of the investors may be inconsistent in some respects with the interest of the General Partners of the Partnership and with the interest of the General Partners of the local limited partnerships and their affiliates. In addition, the sellers of the project are also the General Partners of the Local Limited Partnerships . . . there are also other conflicts of interest." Paragraph 2 under Section III points out an investor may have a more limited right of action against the general partners of the partnership and of the local limited partnerships than he would have had absent certain provisions in the partnership agreements. The above provisions being made known to the investors is contrary to the claim of the defendants that "The statements in the CT Page 4243 Private Placement Memorandum would certainly have created a reasonable expectation on the part of the investor limited partners who provided the cash for the transaction that there would be no relationship between the assignors and assignees." The Court fails to find from the PPM that such an expectation could have been created, and there was no testimony in the trial that such an expectation was present. Further, there is no evidence to support, either in the PPM or by testimony, the defendants' claim that the general partners "acted in a way calculated to induce the other partners in the purchasing partnership to believe that they would not enforce the Notes under the circumstances presented in this case."
5. Paragraph 6 at page 33 of the PPM informs the investors of the fifteen year term of the purchase money notes. It points out that each purchase money note is secured by an assignment of the Partnership's interest in the local limited partnership and that if the purchase money note is not paid by the end of the fifteen year term, the Partnership's interest in the local limited partnership may be foreclosed.
6. Under Connecticut law, CGS §§ 34-21 permits any general partner to lend to and transact business with a limited partnership. Also seeKonover Development Corp. v. Zeller, 228 Conn. 206, 230-31 (1994). Conduct that has been authorized by the limited partners, and they were fully aware from the PPM as to what conduct would or could take place, cannot become a basis of a breach of fiduciary duties by a general partner. See Konover Development, supra, at page 227. The defendants were aware or should have been aware that the PPM specifically authorized the remedy of foreclosure. Accordingly the Court finds that the conduct of the plaintiffs and their predecessors was not misleading.
7. The defendants offered no proof of the second prong of the law of estoppel, namely that the other party, in this case, the defendants, must change its position in reliance on the facts that were allegedly misleading, thereby incurring some injury. There was no evidence that the defendants were misled, there was no evidence they changed their position in reliance on the facts that were allegedly misleading or that they incurred some injury. of course, the foreclosure of their interests in the limited partnerships is an injury, but one the potential of which was fully known under the PPM.
8. Further, the plaintiffs, Doris and Michael Konover and Venture, were not partners, general or limited, of any of the defendant partnerships. Therefore, the claim by the defendants that the provisions in the purchase and sale agreement and the PPM that the notes would not be transferred to persons who were partners in the limited partnerships is not applicable. The security interest by the notes and the assignment of partnership interest were taken by Simon Konover and Marvin Patron. It is CT Page 4244 true that the plaintiffs hold their interests in the notes and the assignment of partnership interests by assignments or transfers from Simon Konover and Marvin Patron. However, since the plaintiffs are neither general nor limited partners and only the payees of the notes and the assignees of the Conditional Assignment of Partnership Interests, they are not fiduciaries of the defendants. The defendants have offered no authority for their claim that a fiduciary duty runs with an assignment. See Southbridge Associates v. Garafolo, 53 Conn. App. 11, 19
(1999) in which there was an assignment by the bank or mortgagee to the plaintiff. The Court held that the purchaser of the notes and deeds from the bank did not have a fiduciary relationship to the defendants since that plaintiff was not the original fiduciary. The claim that the plaintiffs Doris and Michael Konover are the wife and son of Simon Konover and that Robert Patron is the son of Marvin Patron, Robert Patron now owning the plaintiff Venture makes them fiduciaries because of their family relationships is without merit. Again, it is the defendants burden to prove that a fiduciary duty exists on the part of the plaintiffs. Defendants have not sustained their burden of proof in this regard, offering no evidence at trial nor any authority for the claim that the fiduciary responsibilities of Simon Konover and Marvin Patron somehow assigned to the plaintiffs as aforesaid.
9. Accordingly, for the reasons stated above, this Court finds no basis for a defense as stated in the first special defense of either equitable estoppel or unclean hands against the plaintiffs.
 2. SECOND AND THIRD SPECIAL DEFENSES: NONJOINDER OF NECESSARY PARTIES
The second special defense is that the property of each limited partnership is encumbered by a first mortgage insured by a United States Department of Housing and Urban Development (HUD) regulatory agreement because it is a HUD insured mortgage. The third special defense is the same except that the mortgages are also governed by a Connecticut Housing Finance Authority (CHFA) regulatory agreement. Defendants claim the aforementioned regulatory agreements prohibit any assignment of partnership interest without the consent of HUD and CHFA which consent has not been obtained. Accordingly, defendants claim that both HUD and CHFA are necessary parties to this action, and their nonjoinder to this action prevents the plaintiffs from recovering judgment. The Court finds as follows:
1. Although the special defenses use the term "necessary party" defendants' brief of January 25, 2001, page 14, claims that HUD and CHFA are "necessary, indispensable parties to this action". Emphasis added. Plaintiffs Michael and Doris Konover filed a Motion to Strike these special CT Page 4245 defenses, which motion was granted on September 17, 1999, Beach, J. In his decision Judge Beach stated: "Motion to Strike 2d and 3d defense granted. Motion to Strike is the exclusive remedy for nonjoinder. CPB Sections 10-39
and 11-3." This Court agrees with Judge Beach. CPB Section 9-19 states inter-alia "except as provided in Sections 10-44 and 11-3 no action shall be defeated by the nonjoinder or misjoinder of parties." CPB Section 11-3
states in pertinent part: "As set forth in Section 10-39, the exclusive remedy for nonjoinder of parties is by motion to strike." The defendants did not file a motion to strike for nonjoinder of parties, and based upon that the nonjoinder of parties should not be used as a special defense.
However, in W.G. Glenney Co., v. Bianco, 27 Conn. App. 199, 202-203
(1992) the Court stated in regard to the Motion to Strike: "Our Supreme Court has held that `[t]his exclusive remedy applies to nonjoinder of indispensable parties'." In Glenney, supra, the Court cited Gaudio v.Gaudio, 23 Conn. App. 287 (1990) and stated that ". . . this Court agreed with the defendant and reviewed the claim because, if the party that was not joined truly was an indispensable party, the action could not `be disposed of properly on its merits. . .' . . . therefore, despite the absence of a Motion to Strike the claim of nonjoinder of an indispensable party is not waived on appeal." Accordingly, this Court will review whether HUD and/or CHFA are indispensable parties.
"A party is defined as indispensable if its interest in the case is such that a final judgment cannot be entered without either affecting the party's interest or leaving the case in such condition that its final resolution may be inconsistent with equity and good conscience."Glenney, supra, id. 203. Defendants claim that HUD and CHFA are indispensable parties because based upon the first mortgages operation of each of the properties is subject to the terms of regulatory agreements issued by HUD and CHFA, and the regulatory agreements prohibit any assignment of partnership interest without the consent of HUD and CHFA. There was no evidence presented, either way, as to whether or not such consents were obtained from HUD and CHFA. This Court finds that judgment for the plaintiffs in this action does not affect the first mortgages insured by HUD and/or CHFA. The first mortgages would remain. The only difference is that the owners of the limited partnerships would change to that of the plaintiffs. There has been no evidence that the plaintiffs are not as reliable as the people or entities that presently own the limited partnerships. If the first mortgages are not kept current by the plaintiffs, the mortgagees would still have the option of foreclosing on the properties. Further, such assignments to the plaintiffs would certainly not be voluntary and would be by judicial order. Consent would not be required in the event of an involuntary assignment which would be the case if the plaintiffs prevail in this action. Additionally, this Court finds that judgment for the plaintiffs would not be "leaving the CT Page 4246 case in such condition that its final resolution may be inconsistent with equity and good conscience." Glenney, id. 203. There can be proper disposition of this case which is consistent with equity and good conscience if the plaintiffs prevail and certainly if the plaintiffs prevail, it would be consistent with equity and good conscience as to HUD and CHFA. Also, this issue appears to be relatively insignificant for the defendants because if the defendants truly believed that HUD and CHFA were indispensable parties, the defendants would have moved to implead them or the defendants would have moved to strike the plaintiffs' complaint for failure to join an indispensable party, neither of which the defendants did. Accordingly, the second and third special defenses are rejected as to all plaintiffs, and judgment is entered for the plaintiffs on the defendants' three special defenses.[2]
 PLAINTIFFS' CLAIM OF FRAUDULENT TRANSFERS
It is true that each promissory note does say in pertinent part: ". . . no payment or prepayment of principal in any amount or any payment of interest shall be made except from surplus cash as such term is defined . . ." First, it has been proven by clear and convincing evidence that the notes were due fifteen years from date or November 29, 1997 or upon a sale or refinancing of the properties which has not occurred. The only logical explanation of the words "due" or "due date" or "due and payable" is November 29, 1997, the maturity date of the note. Next we must look at whether there was surplus cash available from which the notes could be paid on or after November 29, 1997. By clear and convincing evidence, there was such surplus cash available and based upon the testimony of David Siegel[3] no payment was made on any of the notes.
As to whether there was surplus cash available, plaintiff's Exhibit 47 as described by Mr. Siegel (TT 9/20/00 pages 7-14) at the end of 1997 $4,473 was distributed to the owners' account, the owner being the limited partnership. The $4,473 is as to Mohegan Park. The same was true at the end of 1997 (column 3 of Exhibit 47) as to the other four partnerships, with the result that a total of $114,635 was distributed to the owners' accounts. The money was then distributed to the limited partners and the general partners according to their percentage interests.
Plaintiffs Exhibit 48 lists the various properties and according to Mr. Siegel, the amounts at the end of 1997 and distributable in 1998 (column 9) were the sums of $16,895 for Mohegan Park, $15,439 for Mohegan Village, $6,938 for Moosup Gardens, nothing for Windham Heights I and $15,269 for Windham Heights II, but according to Mr. Siegel the amounts actually distributed were $5,000 for each of the aforementioned four limited partnerships. Plaintiffs' Exhibit 31 which is a Memorandum CT Page 4247 dated October 17, 1997 from David Siegel to Michael Konover and Simon Konover, was in regard to the subject purchase money notes. In it Mr. Siegel summarizes information obtained from Ivy Yates of TIG-RFA, Inc., which is one of the defendants and states in paragraph two as follows:
 "2. Ivy's Proposal to Purchase Money Note Holders. Approximately $4.3 million of gross proceeds is available after payment of the first mortgages, to which is added amounts held in various reserves. Ivy's figures show that $1,718,628 is available in reserves, bringing the total of gross proceeds to $5,993,984. This $1,718,628 figure is comprised of $213K of funds now held in NEIA accounts as a reserve for paying off the purchase money notes . . . Ivy proposes to distribute the $5,993,984 of gross proceeds as follows: . . . e. Net to Note Holders. The preceding distribution results in an amount of $4,043,206 available to the note holders, or more likely, an amount of $3,421,594 available should the residual receipts not belong to the owner upon a sale and should replacement reserves not be as great as anticipated. The approximate balance of the loans, including principal and accrued interest, at maturity in November 1997 will be $5,581,969."
Plaintiff's Exhibit 43 is a fax from the Cafritz Group on the letterhead of the Investment Group from Jon Herman to David Siegel dated July 10, 1998. Please note that July 10, 1998 is after the due date of the notes, November 29, 1997. TIG-RFA, Inc. and Cafritz were integral parts of the operations of the five partnerships. Said Exhibit 43 shows the computation of surplus cash in the various limited partnerships as follows as of December 31, 1997, slightly more than a month after the due date of the notes:
Mohegan Park L.P ........................$32,501
Mohegan Village L.P .....................$25,571
Windham Heights II L.P ..................$15,269
Windham Heights I L.P ..deficiency......$25,292
Moosup Gardens LP .......................$ 6,938
Exhibit 43 also shows that the aforementioned limited partnerships had distributed amounts during the fiscal period covered by this statement CT Page 4248 including Windham Heights I which had a deficiency.
Further, Mr. Siegel testified TT 9/20/00 page 32, ". . . the original balance of over $200,000 was money that was made as distributions to NEIA as a limited partnership." Mr. Siegel testified on page 38 of TT 9/20/00 that in June of 1997 $114,635 was distributed from surplus cash . . ." He stated on page 39 that the general partners were "well aware of the fact that the notes would be maturing in November of 1997 . . . and there were insufficient funds in the five limited partnerships to pay the notes". On page 40 Mr. Siegel agreed with the statement that "and at the time of the distributions in 1998, whatever the amount were, the five purchase money mortgage notes had not been paid, and you were aware of that". Mr. Siegel replied "correct". This testimony certainly shows, by clear and convincing evidence, that distributions of cash surplus were made prior to November 29, 1997 and subsequent thereto, even though the defendant knew that the notes were due on November 29, 1997, and the defendants limited partnerships did not have the funds to pay them off.
Therefore, by clear and convincing evidence the Court finds that there was surplus cash available both prior to November 29, 1997, but, more importantly, subsequent to November 29, 1997 and that none of the surplus cash that was available both before and after November 29, 1997 was paid on the notes as required. The only interpretation of the due date of the notes is November 29, 1997 with the restriction that payment of same could only be made out of surplus cash. The surplus cash was available, and payment was not made therefrom, and accordingly, failure to make these payments from surplus cash was clearly an event of default on each note, thereby making them due and payable in full at the times surplus cash was distributed to the limited partnerships. There is no question that these were events of default on all of the notes as indicated. Surplus cash was available before and after November 29, 1997, and it was not paid over in payment of these notes.
 WERE THESE TRANSFERS FRAUDULENT TRANSFERS?
Plaintiffs have cited CGS §§ 52-552e as support for their claims that certain transfers were fraudulent as to their clients who are present creditors.[4]
The first criteria of fraudulent transfers is that the creditor's claim arose before the transfer was made or the obligation was incurred and the debtor made the transfer or incurred the obligation.[5] The due date of the notes was November 29, 1997, and there is still clear and convincing evidence that several transfers (surplus cash) were made after November 29, 1997. The next criteria is in paragraph (2) that states that debtor did not receive a reasonable equivalent value in exchange for the CT Page 4249 transfer or obligation. Plaintiffs fail in their burden of proof on this criteria because as pointed out in defendants' post trial memorandum dated February 8, 2001, page 21, the limited partners were investors and the value they contributed to the limited partnership was their investment without which the partnership could never have existed. In the case of the general partner TIG-RFA, Inc., the value it had contributed was the syndication of the partnerships and as far as the general partners, Simon Konover and Marvin Patron and their successors, the value they contributed was their expertise in developing and managing the projects. However, our examination does not end there. It should be noted that the word between (1) and (2) is "or". It has been established that (2) is not operative and the use of the word "and" in "and the debtor (A). . . . as they became due" is meaningless unless it was established that the transfers were made without receiving a reasonably equivalent value in exchange for the transfer or obligation.
This leave us with determining whether paragraph (1) has been proven. It states: "With actual intent to hinder, delay or defraud any creditor of the debtor". This leads us to subsection (b) which sets forth eleven factors to which consideration may be given, among other factors, in determining actual intent. Emphasis added. (1) the transfer was to an insider, in this case the partnerships and subsequently the general partners and the limited partners, (3) the transfer was disclosed to some of the plaintiffs in that they received distributions and were aware of it. This is, therefore, not a factor. (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred, or (10) the transfer occurred shortly before or shortly after a substantial debt was incurred."[6] In this case the defendants (debtors) were insolvent at the time that the transfer was made. According to the testimony of Mr. Siegel the partnerships were not able to pay their debts as they became due, namely the five notes, and yet, they made the transfers regardless. The transfers occurred shortly before the due date of November 29, 1997, on or before June 1997 or shortly after a substantial debt was incurred which transfers would have been distributions made in 1998. If one takes the position that the notes were not due until November 29, 1997, which is the defendants' position, the substantial debt was incurred on November 29, 1997 and, therefore, the transfers occurred shortly before and shortly after November 29, 1997. The Court must also take into account, from the totality of the evidence, including Mr. Siegel's testimony, that the defendants made these transfers knowing that the funds should have gone to payment of the notes, and, therefore, they tried to keep the funds away from the creditors, namely the plaintiffs. Mr. Siegel, Mr. Herman and others acting for the defendants were sophisticated property managers, with expertise in syndication of limited partnerships, in the finances involved in same including purchase money notes and were well aware of CT Page 4250 the consequences of their making these transfers. This is a major factor in establishing fraudulent intent.
"A fraudulent conveyance must be proven by clear and convincing evidence." Tessitore v. Tessitore, 31 Conn. App. 40, 43 (1993). It is also clear that the defendants must have reasonably believed they would incur debts beyond their ability to pay as they became due. The notes were certainly due on November 29, 1997, and yet instead of paying the notes, they transferred funds to the partners.
Whether a conveyance or transfer is fraudulent is a question of fact, which often must be inferred from surrounding circumstances. Shawmut Bankv. Brooks Development Corp., 46 Conn. App. 399, 406 (1997). From the totality of the evidence including the surrounding circumstances and for the reasons stated above, this Court finds by clear and convincing evidence that the defendants distribution of cash to the limited partnerships, limited partners and/or general partners made in 1996 and 1997 as well as 1998 were fraudulent transfers, and the Court hereby orders that said funds be returned to the respective limited partnerships so that said limited partnerships may make payments to the plaintiffs. Defendants are ordered to provide to the Court within fourteen days hereof an exact list of the payments made from surplus cash in 1996, 1997 and 1998, when such payments were made and to whom they were made, with names and addresses. The Court will then issue a supplemental judgment specifically ordering the return of said funds as indicated.
 3. WHETHER THERE HAS BEEN A DEFAULT ON THE NOTES
It has been conceded by the parties, and the Court so finds, that the five promissory notes, plaintiffs' Exhibit 1 through 5, are the same except for the names of the parties and the amount. This is also true of the Conditional Assignments of Partnership Interest which were to secure the aforementioned five notes, and it is also true as to the real estate Purchase and Sales Agreement as to all five properties. They are all identical except for the amount of the face amount of the note and the identity of the sellers and purchasers. Accordingly, the Court has considered the $591,900.00 note from Moosup Gardens Limited Partnership to Moosup Gardens Associates which is plaintiffs' Exhibit 3, the Conditional Assignment of Partnership Interest between the Moosup Gardens Limited Partnership, the General and Limited Partners of Moosup Gardens Limited Partnership and Moosup Gardens Associates which is plaintiffs' Exhibit 10, and plaintiffs' Exhibit 12, which is the Conditional Assignment of Partnership Interest for Windham Heights II Limited Partnership, and is the same as Moosup Gardens Limited Partnership except for the parties and the amount, but is more readable. The Partnership is identified as the Obligor, the General and Limited Partners are CT Page 4251 identified as the Assigning Partners and Moosup Gardens Associates or Windham Heights Associates II is identified as the Secured Party. The Court has also reviewed the Real Estate Purchase and Sale Agreement in regard to Mohegan Village Associates (Defendants' Exhibit B) which is identical with the exception of the amount and the parties to the Real Estate Purchase and Sale Agreement regarding Moosup Gardens Limited Partnership and the three other Real Estate Purchase and Sale Agreements. The notes and the assignments are both dated November 29, 1982 and the Agreements are dated August 27, 1982.
As defendants point out in their February 8, 2001 Reply Brief, page 7, ". . . it is black letter law that the provisions of a document must be read together in interpreting the document". The Court and apparently the Plaintiffs agree with that statement and the Court further finds that the note and the Conditional Assignment Partnership Interest should be read together with reference to the Real Estate Purchase and Sale Agreement as well.
As to these documents and based upon the totality of the evidence, the Court makes the following findings:
 1. The note does provide that ". . . no payment or prepayment of principal in any amount or any payment of interest shall be made except from surplus cash as such term is defined. . .". The Court rejects the claim that such language refers only to prepayment. The question then becomes whether or not there was surplus cash available to make the payments prior to and/or subsequent to November 29, 1997 which is the maturity date of the notes. For the reasons stated in the section herein entitled PLAINTIFFS' CLAIM OF FRAUDULENTTRANSFERS, the Court finds that there was surplus cash available both prior to and subsequent to November 29, 1997, none of the surplus cash was paid on the notes, and the nonpayments at least subsequent to November 29, 1997 was an Event of Default.
2. The Court must also look at the third paragraph of the note which provides in pertinent part: "In the event interest or principal is not paid when due and there is no surplus cash available for any such Payment, the Payee shall have no right to collect any portion of the unpaid obligation from the Property or from sums received out of the operation of the Property. Payee'ssole remedy under such circumstances shall be to proceedunder the Assignment and Security Agreement hereinafterCT Page 4252referred to." Emphasis added. The due date was November 29, 1982, fifteen years after the date of the note. Defendants admit that there is no surplus cash available for any payment. ". . . here is no dispute that the Local Limited Partnerships do not have the surplus cash to make these payments." Defendants' Brief of February 8, 2001, pg. 10.
3. Therefore, under the third paragraph of the note, the Court must look at the Conditional Assignment of Partnership Interest, plaintiff's Exhibits 10 and 12. Paragraph 1. Assignment
 (a) The Assigning Partners do hereby conditionally transfer, assign, convey and grant to the Secured Party all their rights, title, and interest in and to the Interests[7], including but not limited to all rights the Assigning Partners may have to profits, cash flow and distribution in connection with such interests".
It further provides in ¶ (b) that ". . . this security interest shall become effective at the option of the Secured Party in the event that any Event of Default has not been cured within 90 days after notice of such Event of Default has been given by the Secured Party to the Obligor and the Assigning Partners."
Notice of such Event of Default was properly given by the Secured Party to the Obligor, Moosup Gardens Limited Partnership, and the general and limited partners of Moosup Gardens Limited Partnership, and the default was not cured within ninety days after such notice and still has not been cured. The same applies to all of the notes and Conditional Assignments.
Paragraph (c) of paragraph 1. provides that "The Secured Party shall not have any right to profits, cash flow, and/or distributions or any other incident of ownership in the Interests unless and until it exercises its rights as set forth in (b) above." Such rights have been exercised.
 4. Under paragraph 2(c) "Enforcement of Rights" of the Conditional Assignment, the Court finds no credible evidence that the event of default was attributable to the failure of New England Investment Associates 1982 to make required capital contributions to the limited partnership. Additionally said paragraph (c) would apply only when the amount in default and the total amount payable under Section 3 CT Page 4253 (c) of the Purchase Agreement are not the same. They are the same in this case. Paragraph 3(c) of the Purchase and Sale Agreement is the amount of the principal of the note, none of which has been paid.
 5. The Court then looks at Paragraph 2(d) of the Conditional Assignment which states, inter alia, "In the case of an Event of Default other than as described in Paragraph 2(c) above, Secured Party shall have all the right of a Secured Party as in effect in the State of Connecticut. The recovery of the Secured Party pursuant to this Assignment shall be limited to an amount equal to the unpaid balance of the purchase price for the Project plus any and all fees, costs and expenses incurred by the Secured Party, including reasonable attorneys fees, incurred incident to the enforcement or foreclosure of the security interest of the Secured Party, whether through judicial proceeding or otherwise. Expenses of retaking, holding, preparing for sale, selling or the like shall be included in the Secured Party's reasonable attorneys fees and legal expenses." The unpaid balance of the purchase price is the amount due under the note, including interest, plus attorneys fees, costs, and expenses. In the case of Moosup Gardens Limited Partnership the amount would be $591,900.00 plus accrued interest at 13.25% per annum from November 29, 1982 to date. The same is true of all of the five notes which is the face amount of the note plus interest, costs and attorneys fees. Final interest, costs and attorneys' fees are to be determined at a future hearing.
Accordingly, the Court finds that all five notes are in default in the amounts thereof as set forth in Schedule A attached hereto and made a part hereof due and payable now to the plaintiffs Michael Konover, Doris Konover, and 7301 Venture Holding as their interests may appear which are also set forth on Schedule A attached hereto and made a part hereof.
Judgment is entered for the plaintiffs on all counts of the Second Amended Corrected Complaint in the amounts set forth on Schedule A with the exception of additional interest, attorneys fees and costs to be determined at a future hearing. Further, foreclosure of the interests in the Limited Partnerships as described in each Conditional Assignment of Partnership Interest is granted, and said plaintiffs are hereby awarded title to same in accordance with their respective interests as set forth CT Page 4254 in Schedule A.
Additionally, defendants are ordered to provide to plaintiffs immediate access to the books and records of all five Limited Partnerships.
Plaintiffs are ordered to prepare an appropriate charging order and/or supplemental judgment to be submitted to the Court prior to the hearing to be held on the amount of interest, costs and attorneys' fees to be assessed.
 _______________________________ RITTENBAND, JUDGE TRAIL REFEREE