SHAWMUT BANK *v.* BROOKS DEVELOPMENT
CORPORATION ET AL.

WESTFAIR, INC. *v.* TORREY D. BROOKS ET AL.
(AC 16119)
(AC 16121)

Dupont, C. J., and Spear and Freedman, Js.

Argued June 9—officially released August 26, 1997

*Geoffrey A. Hecht*, with whom, on the brief, was *Milton I. Caplan*, for the appellants (defendant Westfair, Inc., et al. in the first case, plaintiff in the second case).

*David C. Pite*, for the appellants (defendant Torrey D. Brooks et al.).

*Howard C. Kaplan*, with whom was *Randall M. Skigen*, for the appellee (plaintiff in the first case, defendant Shawmut Bank in the second case).

*Opinion*

DUPONT, C. J. These appeals concern two separate cases that were consolidated for trial. One action was brought by Westfair, Inc., against Torrey D. Brooks, his wife Lauren F. Brooks, Connecticut National Bank (now Fleet Bank), Westport Bank and Trust Company, and Westbrook, Inc., to foreclose on a mortgage encumbering certain real estate.[1] The other action was brought by Shawmut Bank (now Fleet Bank) against Brooks Development Corporation (Development), Torrey D. Brooks (Torrey), Lauren F. Brooks (Lauren), Brooks,

---

[1] In the foreclosure action, Connecticut National Bank, one of the defendants, cross complained against Lauren Brooks and Torrey Brooks, alleging that their conveyance to Westfair, Inc., was fraudulent. That is the same claim that is the subject of the second action.

Torrey and Scott, Inc. (BTS), and Westfair, Inc. (Westfair), to collect on a promissory note, which was unsecured, and to set aside as fraudulent two mortgage conveyances, one of which was the conveyance at issue in the foreclosure action.

The trial court, *Grogins, J.*, rendered judgments in favor of Shawmut Bank, formerly Connecticut National Bank (CNB), in accordance with a report of the attorney trial referee before whom these matters were tried. The court rendered identical judgments in both actions, setting aside the mortgages of Lauren and Torrey to Westbrook and to BTS as fraudulent and ordering that payment to CNB[2] be made from money held in escrow from the sale of real estate of Lauren and Torrey. The escrow funds were the subject of a prior order of the trial court, *Leheny, J.*, dated August 4, 1993, in the action filed by Westfair. Westfair, as the plaintiff in the foreclosure action and the defendant in the fraudulent conveyance action and Lauren, Torrey and BTS, the defendants in the fraudulent conveyance action, appeal from the judgments. We affirm both judgments.

The appellants claim that the trial court improperly determined that the mortgage conveyances were fraudulent. In addition, Torrey and Lauren claim that any interest CNB had in the real property of Torrey and Lauren by virtue of an attachment dated September 18, 1990, and recorded September 25, 1990, which secured the debt on the promissory note, was discharged in bankruptcy.

Development was a real estate development company established by Torrey and Lauren. In 1986, Development

---

[2] Shawmut Bank was substituted for CNB as party plaintiff on May 17, 1995, pursuant to a name change in January, 1993. We refer to CNB since it was the party in interest when the transactions relevant to this appeal occurred. By the time the appeals were taken, Fleet Bank was the real party in interest in both cases as the successor to both CNB and Shawmut.

began construction of a condominium project in Norwalk known as Tealbrook. To help finance the project, Development established a $500,000 line of credit with CNB. The loan was personally guaranteed by Torrey and Lauren in 1988. It is that loan that is the subject of one of the lawsuits.

By March, 1990, Development had drawn down the entire line of credit. On March 9, 1990, CNB agreed to renew the loan as an unsecured note due and payable on May 31, 1990. That note was intended to be a short term extension of the loan to permit review of the loan for another renewal. CNB agreed to an unsecured note in recognition of a long-standing business relationship with Torrey's father, Dexter Brooks, and in reliance on a financial statement submitted by Torrey and Lauren.

The financial statement listed, as principal assets, Torrey and Lauren's residence in Stamford and their stock in closely held family corporations. The residence was listed as having a value of $875,000, encumbered only by a first mortgage of $295,695. Torrey and Lauren had committed themselves to provide a mortgage on their home to Westfair on March 8, 1990, one day prior to the agreement of CNB to renew the loan. Later, on April 16, 1990, they committed themselves to provide a mortgage to BTS.[3] The mortgage commitments were provided as security for antecedent loans made to Development by Westfair and BTS in 1990, when the Tealbrook project began to fail. The proceeds of the loans were used to pay debts of Development, including interest on the CNB loan. In addition to the omissions relating to the mortgage commitments, the financial statement of Torrey and Lauren omitted debts owed to various creditors, and it omitted debts of Development that were personally guaranteed by Torrey and Lauren.

---

[3] These mortgage commitments were evidenced by corporate resolutions.

There were also inaccuracies with respect to the valuation of stock owned by Torrey and Lauren in the family corporations of Development, BTS, Westfair and Westbrook.

Ultimately, Torrey and Lauren defaulted on payment of the note. Thereafter, CNB entered into negotiations with BTS and Dexter Brooks, acting on behalf of that entity, for renewal and modification of the loan. When those negotiations failed, CNB made a demand for payment of the note on August 2 and again on August 17, 1990.

On August 21, 1990, Torrey, as vice president of Development, sent a letter to Dexter Brooks, as president of Westfair, in which he and Lauren offered to mortgage their home as security for the loans made to Development by Westfair. On the same date, Torrey sent a similar offer to Dexter Brooks, as president of BTS, for the loans made to Development by that corporation. Thereafter, on September 12, 1990, Torrey and Lauren executed a mortgage deed for $190,000 to BTS and a mortgage deed for $140,000 to Westfair of the real estate on which their family home was located. The mortgages were recorded on September 17, 1990.

Pursuant to General Statutes §§ 52-278a through 52-278f, CNB sought and obtained an ex parte prejudgment real estate attachment as allowed in commercial transactions in which defendants have waived their rights to a notice and a hearing on whether probable cause exists to sustain the validity of an attachment on real estate. See General Statutes § 52-278f. The defendants do not claim that any statute was violated in the obtaining of the prejudgment remedy, which is dated March 12, 1991, as ordered by the court, *Mottolese, J.* On August 4, 1993, Torrey and Lauren moved to sell the subject real estate "free and clear of all encumbrances,"

and their motion was granted on August 16, 1993.[4] In February, 1994, Torrey and Lauren filed a voluntary petition in bankruptcy, and obtained a discharge in bankruptcy on May 16, 1994. These cases, which had been stayed while the voluntary bankruptcy proceedings were pending, were then tried to completion and judgments were rendered on June 14, 1996.

Westfair and BTS are corporations owned by members of the Brooks family. As of 1990, Torrey owned 24 percent of the stock in BTS and 23.33 percent of the stock in Westfair. At all times prior to September, 1990, Torrey was an officer and director of both corporations. Torrey was a salaried employee of BTS, earning approximately $80,000 per year. Dexter Brooks owned 30 percent of the stock in Westfair and 28 percent of the stock in BTS. In 1990, Dexter Brooks was the president and chief executive officer of both corporations. Torrey's brother, Scott Brooks, and his sister, Wendy Brooks, each owned approximately 24 percent of Westfair and BTS. Torrey, Lauren and Dexter Brooks together owned all of the stock of Development. These family corporations operated out of offices at 136 Main Street in Westport, in a building owned by Dexter Brooks.

In January, 1991, Westfair brought its action to foreclose the mortgage it held on the Stamford residence of Torrey and Lauren. Shortly thereafter, CNB brought its action against Torrey and Lauren and the family corporations to collect on the promissory note Torrey and Lauren had given it, and to set aside their conveyances to Westfair and BTS as fraudulent, in connection with which it had sought and obtained the prejudgment remedy of a real estate attachment, recorded in September, 1990. After Westfair decided to institute its foreclosure action, it made two additional loans to Torrey

---

[4] An involuntary petition in bankruptcy had been filed on November 7, 1991, by CNB against Lauren Brooks and Torrey Brooks, which was dismissed in May of 1993. The proceedings in both cases, which are the subject of this appeal, were therefore stayed until that dismissal.

and Lauren. Torrey and Lauren lived in the Stamford residence until the house was sold in 1993.[5]

## I

## THE FRAUDULENT CONVEYANCES

Westfair, as plaintiff in the foreclosure action, and Torrey and Lauren, as defendants in the fraudulent conveyance action, claim that the conclusion of the attorney trial referee and the trial court that Torrey and Lauren fraudulently granted the subject mortgages, and that Westfair and BTS participated in the fraud, is not supported by the facts in this case.

"In addressing a challenge to the facts found by the trial referee and adopted by the trial court, this court's function is to determine whether those findings were clearly erroneous." (Internal quotation marks omitted.) *Stamford* v. *Kovac*, 36 Conn. App. 270, 274, 650 A.2d 626 (1994); Practice Book § 4061. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Rosick* v. *Equipment Maintenance & Service, Inc.*, 33 Conn. App. 25, 41, 632 A.2d 1134 (1993).

Against this background, we now discuss the trial court's conclusion that there was a fraudulent conveyance. " 'The party seeking to set aside a conveyance as fraudulent bears the burden of proving either: (1) that the conveyance was made without substantial consideration and rendered the transferor unable to meet his

---

[5] The house was sold pursuant to an August 16, 1993 court order that all parties release their encumbrances and that, after payment of the first mortgage and all outstanding taxes, the funds from the sale of the house would be placed in escrow until resolution of these cases. The house was sold on October 29, 1993.

obligations; or (2) that the conveyance was made with a fraudulent intent in which the grantee participated. *Bizzoco* v. *Chinitz*, 193 Conn. 304, 312, 476 A.2d 572 (1984); *Zapolsky* v. *Sacks*, 191 Conn. 194, 200, 464 A.2d 30 (1983). The party seeking to set aside the conveyance need not satisfy both alternatives. *Bizzoco* v. *Chinitz*, [supra, 312].' " *Wendell Corp. Trustee* v. *Thurston*, 239 Conn. 109, 115–16, 680 A.2d 1314 (1996), quoting *Tyers* v. *Coma*, 214 Conn. 8, 11, 570 A.2d 186 (1990). In this case, the trial referee found that the conveyances were made with fraudulent intent in which the transferees participated, and it therefore found the existence of actual fraud. See *Tessitore* v. *Tessitore*, 31 Conn. App. 40, 42, 623 A.2d 496 (1993); see also *Crepeau* v. *Gronager*, 41 Conn. App. 302, 309, 675 A.2d 1361 (1996). It is that conclusion that the appellants contest.

"The determination of the question of fraudulent intent is clearly an issue of fact which must often be inferred from surrounding circumstances. . . . Such a fact is, then, not ordinarily proven by direct evidence, but rather, by inference from other facts proven—the indicia or badges of fraud." (Internal quotation marks omitted.) *Cook* v. *Bieluch*, 32 Conn. App. 537, 551–52, 629 A.2d 1175, cert. denied, 228 Conn. 910, 635 A.2d 1229 (1993).

The Uniform Fraudulent Transfer Act, General Statutes § 52-552 et seq., sets forth factors that a court may consider in determining actual intent. Although Connecticut had not yet adopted the uniform act at the time of the transfers herein,[6] the court in *Molitor* v.

---

[6] At the time of the conveyances at issue in this action, General Statutes (Rev. to 1989) § 52-552 was in effect. It stated: "All fraudulent conveyances, suits, judgments, executions or contracts, made or contrived with intent to avoid any debt or duty belonging to others, shall, notwithstanding any pretended consideration therefor, be void as against those persons only, their heirs, executors, administrators or assigns, to whom such debt or duty belongs." Section 52-552 was repealed by Public Acts 1991, No. 91-127, § 13, and General Statutes §§ 52-552a through 52-552*l*, the Uniform Fraudulent Transfer Act, was adopted.

*Molitor*, 184 Conn. 530, 440 A.2d 215 (1981), observed the strong similarities between the act and the Connecticut law of fraudulent conveyances. The court stated that the act, like the law in Connecticut, is "largely an adoption and clarification of the standards of the common law." Id., 535.

The trial referee's ultimate finding of fraudulent conveyances demonstrates that he relied on factors such as those enumerated in the act in determining actual intent, namely, whether: "(1) The transfer or obligation was to an insider, (2) the debtor retained possession or control of the property transferred after the transfer, (3) the transfer or obligation was disclosed or concealed, (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit, (5) the transfer was of substantially all the debtor's assets . . . (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred . . . ." General Statutes § 52-552e (b). Prior to adoption of the act, it had been determined that inferences of fraud can arise from circumstances such as the relationship between the debtor and the transferee, the failing circumstances of the debtor at the time of the conveyances, and the fact that the debtor retained possession of the property after the transfer. *Heise Industries, Inc.* v. *Lerman Container Corp.*, 18 Conn. App. 265, 269, 557 A.2d 564 (1989).

The attorney trial referee found that Torrey and Lauren committed actual fraud because they executed the mortgage deeds when they knew that CNB was actively seeking repayment of their March 1990 note, they concealed their intent to provide a mortgage to Westfair, which had been evidenced on March 8, 1990, one day before they signed the CNB note, they continued to live in the mortgaged property for over two years after Westfair instituted foreclosure proceedings, they

represented to CNB that their residence would be mort-gage free other than the first mortgage, they placed the mortgages on their property after CNB notified them of their intent to institute suit on the note, the mortgage conveyances constituted a transfer of all of their assets, and they were insolvent at the time the mortgages were made. The trial referee found that there was a close business relationship between Torrey and Lauren and the family corporations, Westfair and BTS, and that Dexter Brooks knew that the Tealbrook project was failing and that CNB was interested in protecting its investment loan. From those facts found, the referee then found that the mortgages were transfers to an insider[7] and that Westfair and BTS participated in the fraud. The record in the present case supports those findings of fact, from which the fact of fraudulent con-veyances can be reasonably inferred. See *Zaplosky* v. *Sacks*, 191 Conn. 194, 201, 464 A.2d 30 (1983) ("factual finding based on inferences reasonably drawn from the evidence will stand"); *Cook* v. *Bieluch*, supra, 32 Conn. App. 552. Accordingly, we are unable to conclude that the attorney trial referee's decision that the mortgage conveyances were fraudulent is clearly erroneous.[8]

Lauren, who did not testify at the trial, contends that there is insufficient evidence from which the trial

[7] General Statutes § 52-552b (7) provides in relevant part: " 'Insider' includes: (A) If the debtor is an individual, (i) a relative of the debtor or . . . (iv) a corporation of which the debtor is a director, officer or person in control . . . ." Torrey had been an officer of Westfair and BTS and, in 1990, held 23.33 percent of the stock in Westfair and 24 percent of the stock in BTS. No non-family member owned any stock in Westfair or BTS. It was all owned by Dexter Brooks and his children.

[8] The appellants argue that the facts support a finding that the mortgage conveyances were preferential, not fraudulent. That claim is unavailing because the facts supporting a fraudulent conveyance were within the prov-ince of the attorney trial referee to find because CNB's cause of action was one claiming a fraudulent conveyance. Whether other evidence, if believed, in conjunction with a disbelief of yet other evidence, would support a conclusion of a preferential conveyance was not the issue to be resolved by these cases.

referee could conclude that she intended to commit fraud. We disagree. The trial referee's finding of fraudulent intent as to Lauren is supported by the record. He found that she was a party to all of the relevant transactions herein and maintained a familial relationship with Torrey and Dexter Brooks. The trial referee concluded that she concealed the mortgage commitment, that she continued in possession of the mortgaged property, and that she was under pressure from creditors at the time of the transfers. "This court cannot retry the facts or pass upon the credibility of the witnesses." (Internal quotation marks omitted.) *Rosick* v. *Equipment Maintenance Service, Inc.*, supra, 33 Conn. App. 41.

We conclude that the trial court correctly adopted the referee's finding that there was clear and convincing evidence that both of the mortgage conveyances were made with the fraudulent intents of Torrey and Lauren and that the grantees participated in both.

## II

### THE EFFECT OF BANKRUPTCY ON THE JUDGMENTS

The attorney trial referee found that the prejudgment attachment was in effect when the voluntary bankruptcy proceedings began and concluded that CNB could pursue its fraudulent conveyance action because the attachment was a secured obligation that survived the bankruptcy. The trial court agreed. Torrey and Lauren claim that a prejudgment attachment secures a future judgment on a debt, which judgment cannot be realized once the underlying debt is discharged in bankruptcy. CNB contends, however, that a recorded prejudgment attachment constitutes a judicial lien that survives a discharge in bankruptcy of the underlying indebtedness. According to CNB, the bankruptcy had no effect on the power of the trial court to render judgment. In effect, CNB contends that once the sale

of the attached real estate occurred, their action became an in rem action against the escrowed funds.

In Connecticut, a prejudgment attachment is a provisional remedy afforded to a claimant to secure satisfaction of a judgment in the future. See *Connecticut National Bank* v. *Voog*, 233 Conn. 352, 658 A.2d 172 (1995). The right to a prejudgment attachment in Connecticut is statutory. General Statutes § 52-285; *Ambroise* v. *William Raveis Real Estate, Inc.*, 226 Conn. 757, 766, 628 A.2d 1303 (1993). The requirements for an attachment of real property include recordation of the certificate of attachment on the land records. General Statutes § 52-285. Upon recordation, a claimant obtains an inchoate lien until the time of the judgment. *State* v. *Bucchieri*, 176 Conn. 339, 348, 407 A.2d 990 (1978).

A majority of cases has held that the Bankruptcy Code and its legislative history plainly establish that "valid liens that have not been disallowed or avoided survive the bankruptcy discharge of the underlying debt." *Estate of Lellock* v. *Prudential Ins. Co. of America*, 811 F.2d 186, 189 (3d Cir. 1987), citing *In re Landmark*, 48 B.R. 626 (Bankr. D. Minn. 1985); *In re Atoka Agricultural Systems, Inc.*, 39 B.R. 474, 477 (Bankr. E.D. Va. 1984); *United Presidential Life Ins. Co.* v. *Barker*, 31 B.R. 145, 147 (Bankr. N.D. Tex. 1983); *In re Weathers*, 15 B.R. 945, 950 (Bankr. D. Kan. 1981). " 'A long line of cases . . . allows a creditor with a loan secured by a lien on assets of the debtor who becomes bankrupt before the loan is repaid to ignore the bankruptcy proceeding and look to the lien for the satisfaction of the debt.' " *In re Harris*, 64 B.R. 717, 720 (Bankr. D. Conn. 1986), quoting *In the Matter of Tarnow*, 749 F.2d 464, 465 (7th Cir. 1984). A valid judicial lien is not affected by a discharge in bankruptcy. "[T]he discharge in bankruptcy does not extinguish the underlying debt. It only prevents [the] debtor from being

personally liable for the discharged debt and forecloses collection of any deficiency judgment, thereby limiting the claimant to enforce its collection efforts in in rem actions against property subject to a valid, prebankruptcy lien guaranteeing payment of the debt." *In the Matter of Moscoso Villaronga*, 111 B.R. 13, 18 (Bankr. D. Puerto Rico 1989). That court found that the Bankruptcy Code " 'does not bar the creditor from enforcing a valid, prebankruptcy lien or security interest against property that has been retained by the debtor or the estate after discharge. . . . Actions to collect against the debtor personally are enjoined. The creditor's action in enforcing a lien is against the property in rem and with no recourse against the debtor.' " Id., quoting 1 W. Norton, Bankruptcy Law and Practice §§ 27.02, 27.04.

The issue in this case is not whether Torrey and Lauren's entire debt to CNB was discharged in bankruptcy, or whether it was listed as secured or unsecured in the bankruptcy proceeding, but whether the fraudulent conveyance action and the cross complaint in the foreclosure action survived the discharge in bankruptcy. If they did, the attachment remained viable and available to secure a portion of the debt upon the rendition of judgments in the cases.

In this case, Torrey and Lauren, after the suits were brought against them and after the attachment of their real estate by CNB, moved the court to allow the sale of their residence. The court granted the motion on August 16, 1993, and ordered that all parties release their encumbrances and that after payment of the first mortgage and all outstanding taxes, and a 2.5 percent commission to a broker, the balance was to be held in escrow. The court specifically ordered that no brokerage fee could be paid to "Mr. Brooks" or the brokerage company he owns (Brody Real Estate). The house was sold on October 29, 1993, free and clear of all encumbrances, and the money placed in escrow, as ordered.

The bankruptcy petition of Torrey and Lauren was not filed until February 1, 1994, at which time the attachment had already been released and the escrow account substituted for it. When the bankruptcy petition was filed, the real estate that had been attached by CNB no longer belonged to the debtors. Torrey and Lauren concede in their reply brief that they "had no real monetary interest in the outcome of the litigation [Westfair's foreclosure action in Superior Court] or any personal claim to the escrowed funds remaining from the sale of their former residence."

The only mention of anything filed in the bankruptcy court relating to the real estate attached by CNB was on the statement of financial affairs where the debtors noted that they had transferred their home to a buyer for the sales price of $717,500, and on the schedule of their personal property, where they listed a real estate broker's commission as due them. As previously stated, the court order specifically prevented them (Brody Real Estate)[9] from receiving such a real estate commission.

When the trial court rendered judgment on June 14, 1996, it ordered that CNB be paid from the escrow account. The judgment was not in the amount of the debt, which, as of January 30, 1994, was $642,409. The judgment, thus, did not involve the total debt, but the lesser net amount realized from the sale of the attached real estate, which was being held in escrow, in substitution for the attachment.

General Statutes § 52-304, entitled dissolution of attachment by substitution of bond or lien, provides: "When any estate is attached, or any debt or effects taken by process of foreign attachment, the defendant may apply in writing to the court in which such action may be pending, or any judge thereof, to dissolve the attachment lien upon the substitution of (a) a bond

---

[9] Brody Real Estate is one of the Brooks' family corporations.

with surety or (b) a lien on any other property of the defendant which has an equal or greater net equity value than the amount secured by such attachment." Cash realized from the sale of property attached and placed in an escrow account can be substituted for an attachment and is subject to the same claims as the attachment. *Brainard* v. *Smyth Mfg. Co.*, 178 Conn. 250, 253, 423 A.2d 881 (1979).

A bond or an escrow account substituted for an attachment prior to a bankruptcy can survive the bankruptcy. The liability that gave rise to the need to secure the payment of the debt does not necessarily end with the discharge of the debtor in bankruptcy. See *Pullman Metal Specialty Co.* v. *Lang*, 101 Conn. 26, 32, 124 A. 824 (1924); *J. E. Smith & Co.* v. *Guillet*, 15 Conn. Sup. 388, 390 (1948). This view comports with the majority view that "if the lien attaches prior to the period within which the bankruptcy trustee can avoid it as a preference, it need not be perfected in order to survive a discharge in bankruptcy of the underlying indebtedness. See generally Liens by Garnishment, 4 Collier on Bankruptcy, § 67.10 (14th ed. 1978)." *Transamerica Ins. Co.* v. *Trout*, 145 Ariz. 355, 359, 701 P.2d 851 (1985).

Here the inchoate lien, the attachment, was obtained in 1990, and subsequently converted to an escrow fund in 1993, long before the petition in bankruptcy was filed. CNB had a valid Superior Court order keeping the escrow account in place until the resolution of the fraudulent conveyance and foreclosure actions. That order was rendered before the involuntary bankruptcy petition was filed. CNB could pursue its claim to the escrow account notwithstanding that it could no longer pursue a personal claim against Torrey and Lauren for the balance of the debt owed to it after crediting the escrow sum received. The balance of the debt was the only claim that was discharged in bankruptcy. The bankruptcy petition and the discharge in bankruptcy

had no effect on the power of the court to render judgments in these cases, and to order the disbursement of the funds in the escrow account in accordance with those judgments.

The judgments are affirmed.

In this opinion the other judges concurred.