[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION AND RULING ON MOTION FOR CONTEMPT
After a trial in this action and a companion case, National LoanInvestors, L.P. v. LAN Associates XII, L.P., X03-CV-99-0495407S, as well as a simultaneous hearing on a Motion for Contempt dated May 24, 2001, filed by the plaintiff, the court makes the following findings of fact.
The defendant, Antonio Reale (hereinafter "Reale") has been a successful contractor and commercial real estate developer since 1965 and continues to work in those businesses today. Nella Reale is Antonio CT Page 8203-di Reale's wife of many years. She is a housewife and has never worked outside the home nor has she had an independent source of income aside from the money given to her from her husband, or the companies her husband owns or controls.
Reale has no bank accounts in his own name. Instead, the accounts are in Nella Reale's name. However, Nella Reale neither writes checks nor controls the family banking. Reale himself selected the banks in which the accounts were opened, opened the accounts, is able to sign checks drawn on the accounts and controls the checking accounts. Nella Reale neither questions her husband about the finances nor investigates his financial dealings.
In conjunction with Reale's real estate development over the years, Reale formed a number of companies, including corporations, general partnerships and limited liability companies to hold assets, operate business and funnel monies. One such company is known as LAN Associates XII (hereinafter "LAN XII"). When LAN XII was originally formed, Reale held a 54% interest in the company, his son and daughter each held an 18% interest and a business partner the remaining 10% interest.
Another such company formed by Reale is known as World, LLC. World, LLC has no assets and does no business, but is used to funnel money between Reale's other entities and Reale's wife. Reale's wife allegedly makes loans to this company despite having no income of her own. Reale is the managing member and owns 1% of the company. Nella Reale owns 51% of World, LLC; Joseph Reale, Reale's son, owns 30% and Seraphina Capobianco, Reale's daughter, owns 18%.
A third company is World Properties, LLC. Nella Reale owns a 63% interest in this company, Seraphina and Joseph Reale each own an 18% interest, and Reale owns a 1% interest. Reale manages World Properties, LLC. Although Nella Reale does not perform any work for this or any other company, she sometimes receives a monetary distribution, whether salary or draw, from this LLC. Neither Reale, Joseph Reale nor Seraphina Capobianco, the other three members, receives any such distribution.
All three companies, LAN XII, World, LLC and World Properties, LLC, have the same employees, operate out of the same office space and have the same bookkeeper. The entities do not maintain separate payrolls.
At trial the bookkeeper for each of these companies testified that in order to protect his assets from creditors, Reale would have his various companies transfer their income to Nella Reale, who had no creditors. Then when any of the companies needed funds, they would arrange to have the funds transferred from Nella Reale's accounts back into the CT Page 8203-dk businesses.
Since approximately 1985, LAN XII has owned one asset, a building and adjacent industrial park in Enfield, Connecticut with an address of One Corporate Road (hereinafter "the Enfield Property"). One Corporate Road is a 113,000 square foot building on 9 acres, plus approximately 135 acres of vacant land adjacent. Reale maintains, rent free, a 4,000 square foot office in this building.
LAN XII borrowed money from Chase Manhattan Bank (hereinafter "Chase") to fund its purchase of the Enfield Property and construction of the building. Chase filed a foreclosure action against Reale and LAN XII on the Enfield Property, obtaining judgment against Reale and LAN XII in 1995. Chase's judgment was over $17 million.
The FDIC as Receiver for Central Bank obtained a judgment of foreclosure against Reale and LAN XII on August 2, 1994, arising out of default of a mortgage on property in New Jersey. The foreclosure did not satisfy the debt, and the FDIC obtained a Revised Final Deficiency Judgment in the amount of $6,938,809.26, plus costs and fees in the amount of $66,910.95.
The Plaintiff, National Loan Investors, L.P. (hereinafter "Plaintiff" or "NLI"), is the assignee of the FDIC's deficiency judgment and NLI is the present owner of the judgment. NLI's attempt to collect that judgment underlies this case.
It is undisputed that neither Reale nor anyone else has made any payment of the debt due the Plaintiff. In early 1995, at a time when both the Chase judgment and FDIC judgment were outstanding and litigation was pending, LAN XII owned the Enfield Property but did not have the building leased. By end of that year LAN XII had fully leased the Enfield space to First National Supermarkets (hereinafter "First National"). The First National lease, which is still in effect, was guaranteed by First National's parent company, Koninklijke Ahold N.B. (hereinafter "Ahold"), a so-called triple A tenant.
The First National lease is a triple net lease. First National pays, in addition to rent, real estate taxes, maintenance and all other costs of the building's operation. Based on the fact that this is a triple net lease and was guaranteed by Ahold, the lease is extremely valuable, and, at its inception had a present value to the lessor estimated to be between $11,934,183 and $14,245,406.[1]
At or around the time that Reale leased the Enfield building to First National, he also reached a settlement with the successor in interest to CT Page 8203-dl Chase's judgment, WLL. The terms of the settlement were that WLL would compromise the $17 million judgment and accept $5.2 million in full satisfaction of the debt. To fund the settlement, money was borrowed from People's Bank, secured by a first mortgage in favor of People's Bank on the Enfield Property. Reale and LAN XII applied for the loan. People's Bank loaned the money based on the significant value of the First National lease.
Simultaneously with his obtaining the loan from People's Bank, Reale formed the entity known as World Properties, LLC. World Properties, LLC is the entity that actually borrowed the money from People's Bank which was used to pay off the LAN XII debt.
Reale takes the position that the formation of World Properties, LLC was done at the insistence of People's Bank. He bases this on the testimony of James Cormier, a vice president of People's Bank. However, the commitment letter from People's Bank is to LAN XII, and the formation of a new entity was not listed by People's Bank as a condition for making the loan. Therefore, the court does not find Mr. Cormier's testimony on this point to be credible and finds that World Properties LLC was formed by Reale to keep the Enfield property with its valuable triple net lease out of the hands of the creditors of LAN XII such as the plaintiff.
People's Bank loaned World Properties, LLC $4.9 million against the Enfield Property building and $750,000 against the vacant land. The term of the mortgage loan is ten years. After the formation of World Properties, LLC, WLL then quitclaimed/assigned the Chase judgment to World Properties, LLC. World Properties, LLC then completed the foreclosure and title to the property was transferred from LAN XII into World Properties, LLC. The foreclosure was completed on January 5, 1996 but the loan documents were executed and recorded beforehand on December 29, 1995. The First National lease was assigned from LAN XII to World Properties, LLC on December 29, 1995. It is undisputed that no consideration for the assignment of lease was given to LAN XII from World Properties, LLC.
In addition to the loan from People's Bank, First National lent World Properties, LLC $1 million in consideration for a second mortgage on the Enfield Property. Reale personally guaranteed repayment of this mortgage. Lastly, a third mortgage was given to WLL in consideration for $75,000.00.
All of the monthly payments on the People's mortgage have been made directly to People's Bank by First National Supermarkets pursuant to the lease. First National also pays itself on its own mortgage, and the excess of approximately $480.00 is paid monthly to World Properties, CT Page 8203-dm LLC.
The FDIC's $6 million judgment was outstanding against Reale and LAN XII at the very time that the First National lease was executed and assigned and the above-described foreclosure and financing transactions took place. There was no evidence that the FDIC secured this lien with a judgment on the Enfield Property.
As a result of the transfer of the Enfield Property through the foreclosure to World Properties, LLC, LAN XII was left with no assets with which to pay the FDIC's judgment. The foreclosure took place on January 5, 1996, more than a year after the FDIC obtained its foreclosure judgment and two months after the Final Revised Deficiency Judgment was entered.
Since at least 1989, Reale has assigned vastly different values to the Enfield Property. Reale submitted numerous financial affidavits to banks to obtain financing and to creditors seeking information on his assets. Depending on the purpose for which the affidavit was being submitted, Reale's assets and debts varied significantly despite the fact that the affidavits he signed were executed under oath.
For example, a 1989 financial statement listed the value of the Enfield Property building at $11.6 million dollars and the land at $14.8 million dollars. In 1994, however, the Enfield Property building is valued at $3,553,000.00 and the land at $833,000.00. In a Financial Statement dated March 24, 1997, Reale represented that in 1995 the year of World Properties LLC's "purchase" of the Enfield Property, the building had a fair market value of $7,000,000 and the land had a fair market value of $3,450,000, for a total value of $10,450,000. The court finds that as of 1995 when LAN XII conveyed it to World Properties, LLC, the Enfield Property had a fair market value of $14,500,000, based primarily on the present value of the triple net lease on the property.
With respect to Plaintiff's Motion for Contempt, on or about January 24, 2000, Judge Shortall, pursuant to a stipulation by the parties, and in response to Plaintiff's application for a preliminary injunction, entered an order prohibiting Reale, LAN XII, World LLC and Nella Reale or others on their behalf, from transferring any funds or assets, whether foreign or domestic.
Ignoring the Order, in July of 2000, Reale transferred shares of stock in a construction company in Italy known as TMA Construction which he valued at $440,000, to his daughter, Seraphina Capobianco. The TMA transfer was intentional and was in direct contravention of the Court Order. CT Page 8203-dn
Dicussion of the Law and Ruling
Connecticut General Statutes § 52-552a, et seq., the Connecticut Fraudulent Transfer Act ("U.F.T.A." or "Act") is essentially a codification of the common law fraudulent conveyance suit. Molitor v.Molitor, 184 Conn. 530, 535, 440 A.2d 215 (1981). The purpose underlying both the common law and the statutory fraudulent conveyance action is to ensure the Court's ability to invalidate property transfers that are clearly fraudulent as to present creditors.
The party seeking to set aside a conveyance as fraudulent under the U.F.T.A. must show either that the transfer was made without substantial consideration that rendered the transferor unable to meet his obligations, or that the conveyance was made with fraudulent intent in which the grantee participated. Both alternatives need not be satisfied.Shawmut Bank v. Brooks Development Corp., 46 Conn. App. 399, 699 A.2d 283
(1997). Whether a fraudulent conveyance took place is solely a question of fact to be determined by the trier. Davenport v. Quinn,53 Conn. App. 282, 730 A.2d 1184 (1999).
Connecticut General Statutes § 52-552e (a)(1) provides that:
 A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay or defraud any creditor of the debtor.
In order to establish a claim under this section the plaintiff must establish the following elements: that a transfer took place, that the plaintiff's claim arose before the transfer, and that the debtor intended to hinder, delay or defraud the creditor by making the transfer.
Connecticut General Statutes § 52-552b (12) defines a "transfer,"inter alia, as any mode of disposing or parting with an asset or an interest therein, whether voluntary or not. A foreclosure falls logically within this definition, and the legislative history of the U.F.T.A. supports this conclusion. The U.F.T.A. is "designed to protect creditors. It allows creditors to have a court void a fraudulent transfer if it was a sham or to hide assets." 34. H.R. Proc., pt. 14, 1991 Sess., p. 5355, remarks of Rep. Mintz. Thus, the passing of title from LAN XII to World Properties, LLC through the strict foreclosure in order put title to the building — and the First National Lease — into a clean entity, was a transfer within the meaning of the statute. CT Page 8203-do
The case law also supports the conclusion that the transfer of the Enfield Property which occurred pursuant to the friendly foreclosure was a transfer within the meaning of the U.F.T.A. In Cadle Company v. Gabel,69 Conn. App. 279 (2002) Lawrence Gabel executed a promissory note in the amount of $610,000 in favor of Connecticut National Mortgage Company (CNMC). The note was secured by a mortgage on real property located at 21 North Main Street in Essex. Lawrence Gabel quitclaimed the property to his wife, Elizabeth Gabel, for no consideration and, thereafter, defaulted on the note. In December, 1993, Berkeley Federal Bank Trust, FSB (Berkeley), which then owned CNMC, commenced an action to foreclose the mortgage. The defendants in that foreclosure action were the Gabels, as well as Branford Savings Bank (Branford), a judgment creditor, and Cadle Company's predecessor in interest. In June, 1995, the court in the foreclosure action rendered a judgment of foreclosure by sale. At that time, the fair market value of the property was $695,000 and the debt to Berkeley totaled $750,583. The Gabels appealed from the foreclosure and, while the appeal was pending, Lawrence Gabel organized a group of investors, comprised of friends and family and headed by the defendant Norman Zolot, to fund a trust with the purpose of purchasing the note and mortgage from Berkeley. Berkeley agreed, prior to the issuance of a decision on the appeal, to sell the note and mortgage to Zolot for $250,000. On December 30, 1996, Berkeley assigned the mortgage and endorsed the note to Zolot acting in his trustee capacity. Thereafter, Zolot became the high bidder for the property at the foreclosure sale. The court approved the sale and thereafter Zolot transferred the property back to Elizabeth Gabel for no consideration. Elizabeth Gabel, Lawrence Gabel and their children continued to reside at the property as of the date that Cadle Company started suit.
Thereafter Cadle company filed a complaint which alleged that the transfers surrounding the foreclosure by sale constituted a fraudulent conveyance of the assets of Lawrence Gabel to avoid the payment of the 1994 judgment debt that had been obtained by Branford and subsequently assigned to Cadle Company in violation of the Uniform Fraudulent Transfer Act, Connecticut General Statutes § 52-552a et seq. and also alleged a constructive trust as to the property. Elizabeth Gabel thereafter filed a motion seeking the discharge of the notice of lis pendens for lack of probable cause. She argued, as Reale argues here, that the plaintiff and other creditors were not harmed because the foreclosing bank's debt exceeded the fair market value of the mortgaged property. The trial court disagreed, holding, essentially, that through the "friendly" foreclosure mechanism the Gabels had preserved significant equity in the property for themselves and that equity should have been available for their remaining creditors. CT Page 8203-dp
The Appellate Court in Cadle Company v. Gabel affirmed the ruling of the trial court, holding that there was probable cause to sustain the plaintiff's constructive trust claim even though the Gabel's property had a fair market value less than the amount of the original foreclosing bank's debt. Through the series of transfers in conjunction with the friendly foreclosure of his property, Lawrence Gabel was able to satisfy the bank's debt for $250,000 and retain the property which had a value ranging from two hundred to four hundred thousand dollars greater than that amount, while insulating the property from his creditors.
The Court in Cadle Company v. Gabel relied heavily on the case ofVoest-Alpine Trading USA Corp. v. Vantage Steel Corp., 919 F.2d 206 (3d Cir. 1990), where the District Court found that the defendants, through a series of planned transactions with their secured creditor in which they transferred all of the assets from their wholly owned corporation to a newly formed corporation, "were able to freeze out [the plaintiff, an unsecured creditor of the old corporation] and [the other unsecured creditors] while maintaining for themselves an equity interest in, and full effective control over, the new firm. . . ."
In Voest-Alpine Trading Paige Group was a trouble business with $1.7 million dollars in assets and a debt to a mortgagee bank of $1.5 million and debts to unsecured creditors, including the plaintiff, totaling $800,000. Paige Group was controlled !00% by Marvin and Holley Sue Stabler. Paige Group filed for bankruptcy and the Stablers formed a new corporation, Vantage Steel Corporation, which purchased all of the assets of Paige for half of their value from the bank after the bank foreclosed on the property of Paige. After the foreclosure, Paige had no assets and no secured debt. The Stablers controlled Vantage Steel, which had acquired the assets of Paige at half price, and was free of the Paige unsecured creditors. The Third Circuit Court held that the foregoing series of transfers were effectively one transfer to defraud the unsecured creditors of Paige in violation of the Pennsylavania Fraudulent Conveyance Act, 39 P.S.A. §§ 354-59.
In In Re Carr, 40 B.R. 107 (D. Conn. 1984), Judge Eginton affirmed an order of the bankruptcy court which avoided a creditor's redemption of a debtor's property in strict foreclosure as a fraudulent transfer under the fraudulent transfer provisions of the Bankruptcy Code.
In In Re Fitzgerald, 255 B.R. 807 (D. Conn. 2000), Judge Weil determined that a strict foreclosure was not necessarily determinative of the amount of equity in a debtor's property. Cases from other jurisdictions also recognize that transfers which take place pursuant to foreclosures may constitute fraudulent conveyances. See, Cook v. Cook,574 A.2d 1353, 1355 (Me. 1990) (mother's foreclosure of son's mortgage to CT Page 8203-dq her raised factual questions as to whether foreclosure was fraudulent as to wife's rights in divorce proceeding); Megabank Financial v. AlphaGamma Rho, 841 P.2d 318, 320 (Colo.App. 1992) (mortgage foreclosure may be collusive if it is intended to hinder or delay creditors). These cases demonstrate that a transfer pursuant to a foreclosure can be a transfer within the meaning of the fraudulent conveyance statute.
Reale has argued that the foreclosure of the Enfield Property occurred at a time when the National Loan lawsuit was still on appeal, and, therefore the plaintiff's debt was not a "claim" within the meaning of the U.F.T.A. This argument lacks legal basis. The term `claim' is broadly defined under the statute as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." Connecticut General Statutes § 52-552b (3). It is undisputed that the plaintiff's Revised Final Deficiency Judgment was entered on October 21, 1995. Given the fact that the assignment of judgment from WLL to World Properties, LLC is dated December 21, 1995 and the Certificate of Foreclosure is dated January 5, 1996 title to the property passed while NLI's claim was outstanding, and NLI has therefore established this element of the case.
The final element under § 52-552e (a)(1) requires proof of fraudulent intent. A plaintiff may prove a fraudulent intent either by proving that the transfer was made "(1) With actual intent to hinder, delay or defraud any creditor of the debtor" or by proving that the transfer was made "(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due. . . ."
"The determination of the question of fraudulent intent is clearly an issue of fact which must often be inferred from surrounding circumstances." Town Bank and Trust Co. v. Benson, 176 Conn. 304,308-09, 407 A.2d 971 (1978). Because "fraudulent intent is rarely susceptible to direct proof . . . courts have developed `badges of fraud' to establish the requisite actual intent to defraud." In Re: Kaiser,722 F.2d 1574, 1582 (2d. Cir. 1983). Thus, the following factors are those which a court may consider in determining actual intent: 1) the transfer/obligation was to an insider; 2) the debtor retained possession/control of the property; 3) the transfer was concealed; 4) the debtor was threatened with suit prior to the transfer; 5) the transfer was of substantially all of the debtor's assets; 6) the debtor absconded; 7) the debtor removed or concealed assets; 8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; 9) the debtor became insolvent by the CT Page 8203-dr transfer; and 10) the transfer occurred shortly before or after a substantial debt was incurred and the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. Connecticut General Statutes § 52-552e (b);Shawmut Bank v. Brooks Dev. Corp., 46 Conn. App. 399, 405, 699 A.2d 283
(1997). Fraudulent intent must be proven by clear and convincing evidence. § 52-552e (b); Dietter v. Dietter, 54 Conn. App. 481,737 A.2d 936, cert. denied, 252 Conn. 906 (1999).
The plaintiff has proved by clear and convincing evidence the existence of multiple badges of fraud, all of which support the conclusion that the defendants, Reale, LAN XII and World Properties, LLC, through Reale, intended to and did defraud the plaintiff by removing from its ownership the one asset LAN XII had to satisfy plaintiff's judgment, the Enfield Property. Specifically, NLI has proven that: the transfer was to an insider,[2] in that Reale owned 1% of World Properties, LLC and managed and controlled World Properties, LLC as well as owned and controlled LAN XII and further, that the remaining ownership of each of those entities was in the hands of Reale's wife and children, all of whose interests he controlled, and further, that corporate formalities between the companies were not maintained, in that the companies were run out of the same offices, had the same employees and operated from the same payroll accounts; the debtor retained possession or control of the property after the transfer, in that Reale retained his ownership interest in the Enfield Property by his ownership in World Properties, LLC, and the ownership interest of his wife children, the only other members; the transfer was of substantially all of the debtor's assets, in that LAN XII owned nothing after the transfer as it also assigned the First National Lease; the debtor removed assets, in that the ownership of the Enfield Property and the First National Lease were transferred out of LAN XII; equivalent consideration was not received for the transfer, in that the value of the Enfield Property with the First National Lease was $14,500,000 at the time of transfer and LAN XII became insolvent after the transfer
"Although proof of one or more of these `badges of fraud' does not create a presumption that the transfer was fraudulent, proof of several badges may afford a basis to infer fraud." In Re Jones, 184 B.R. 377, 386
(Bkrtcy D.N.M. 1995).
The plaintiff has proven fraudulent intent under § 52-552e (a)(1) by clear and convincing evidence. Subsection (a)(2) of § 52-552e permits a creditor to prove fraudulent intent by proving that the transfer was made "(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his CT Page 8203-ds ability to pay as they became due . . ."
The key provision under this section of the statute concerns the value of the asset transferred. Here, the court has found that the value of the Enfield Property and the First National Lease was $14,500,000. This value far exceeded the $5 million which World Properties LLC ultimately paid on behalf of LAN XII to Chase's successor in interest to extinguish the foreclosure judgment.
The plaintiff has also established that LAN XII intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due. Reale admitted that the transfer left LAN XII with no assets, and therefore, without ability to pay NLI's judgment . .
Connecticut General Statutes § 52-552f (b) provides:
 A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.
As is set forth above the plaintiff has proved the first element under § 52-552f (b) because the plaintiff's claim arose prior to the transfer of the enfield Property to World Properties, LLC. The second element under this section requires that the transfer have been made to an insider, which plaintiff has also established.
Under § 52-552b (7) (iv), an insider includes a corporation (and, by analogy, an LLC) of which the debtor is a director, officer or person in control. At trial, Reale admitted his interest in and control over all the entities he formed, including World Properties, LLC. Although Reale owned only 1% of World Properties, LLC, the majority ownership (63%) was held by Reale's wife, over whom Reale maintained complete control, and the remaining 36% was owned equally by Reale's children. Thus, under any definition of the word, and certainly under that of the U.F.T.A., World Properties, LLC qualifies as an insider.
With respect to the requirement that the transfer must have been made for the purpose of extinguishing an antecedent debt, the transfer accomplished by the "friendly" foreclosure of the Enfield Property was made to extinguish the antecedent Chase judgment against LAN XII. Reale was in control of both LAN XII and World Properties, LLC, and, therefore, there can be no other conclusion but that World Properties LLC CT Page 8203-dt and Reale were fully aware of the financial status of LAN XII.
In Mullen and Mahon, Inc. v. Mobilmed Support Services LLC, et al.,62 Conn. App. 1, 773 A.2d 952 (2001) the Appellate Court upheld the trial court's finding of a fraudulent transfer pursuant to this section of the U.F.T.A., § 52-552f. In Mullen and Mahon, Inc., the defendant, Mobilmed, Inc., controlled by one Fantry, experienced serious financial problems. Fantry thereafter lent the company some $95,000. Id. at 3. During that time, the plaintiff, Mullen and Mahon, Inc., obtained a judgment against Mobilmed, Inc. While that judgment was outstanding, Fantry formed Mobilmed, LLC, and all of the assets were thereafter transferred into the LLC, leaving Mobilmed, Inc. with nothing with which to satisfy the plaintiff's judgment. The plaintiff filed suit, claiming that the transfer of assets was fraudulent. The trial court agreed, finding that, under § 52-552f, the defendant, Mobilmed, LLC, was an insider and that although a debt to the defendant may have existed, that debt was antecedent to the transfer. 62 Conn. App. at 7.
Similarly here, World Properties, LLC was an insider controlled by Reale created for the express purpose of removing assets from LAN XII in order to avoid the plaintiff's judgment and to obtain the loan from People's Bank. All of LAN XII's assets — namely, the Enfield Property and the First National Lease — were transferred to World Properties, LLC and LAN XII was left with nothing with which to satisfy the plaintiff's judgment. Based on all of the foregoing the plaintiff has proven a fraudulent transfer under § 52-552f by clear, precise and unequivocal evidence.
In order to set aside a conveyance as fraudulent under the common law, the plaintiff must show "either (1) that the conveyance was made without substantial consideration and rendered the transferor unable to meet to his obligations; or (2) that the conveyance was made with fraudulent intent in which the grantee participated." Tyers v. Coma, 214 Conn. 8,11, 570 A.2d 186 (1990). "The plaintiff needs to establish only one of these alternatives. . ., not both." Watson v. Watson, 221 Conn. 698,707, 607 A.2d 383 (1992). With regard to the intent of the grantee, World Properties, LLC, Reale admitted that he owns 1% of the company and fully controls and manages it. Therefore, Reale's fraudulent intent must be imputed to that of the LLC.
Section 52-552a, et seq., is essentially a codification of the common law fraudulent conveyance suit, Molitor v. Molitor, 184 Conn. 530, 535,440 A.2d 215 (1981), and because of the strong similarities between the act and the Connecticut law of fraudulent conveyances, Shawmut Bank,supra at 405, the analysis set forth above applies with equal force to establish the defendants' liability under both the actual and CT Page 8203-du constructive fraud elements of the common law. Therefore, for all of the reasons set forth above the plaintiff has also proven that the transfer of the Enfield Property to World Properties LLC in connection with the foreclosure by Chase was a fraudulent transfer under the common law.
Based on the foregoing judgment may enter in favor of the plaintiff on Counts One through Five of the Complaint,[3] and, therefore orders that the Enfield Property known as One Corporate Road, consisting of a 113,000 square foot building on 9 acres, plus approximately 135 acres of vacant land adjacent, is hereby transferred back into the name of LAN Associates XII.
Motion for Contempt
By Order of Court entered on January 24, 2000, and pursuant to a stipulation of the parties concerning Plaintiff's Application for a Preliminary Injunction, Reale was barred from transferring any assets personally or in his capacity as an officer of any entity except in the ordinary course of business. Notwithstanding the foregoing Order, Reale has admitted transferring out of his name and into that of his daughter, Serafina Reale Capobianco, his shares in the Italian company known as TMA Construction. Specifically, Reale transferred his entire ownership interest in the company T.M.A. (Tecnologia Medica Avanzata DRL) to his daughter, Serafina Reale Capobianco, on July 11, 2000 at a time he was aware that he was under Court Order to refrain from doing so.
Contempt occurs when any person disobeys the order of a judicial authority in the course of a judicial proceeding. Practice Book §1-13A. In this case, Reale's transfer flagrantly violated the January 24, 2000 Order of this Court — an Order to which he himself had consented.
Civil contempt involves the wilful failure to comply with an applicable court order. Marcil v. Marcil, 4 Conn. App. 403, 405, 494 A.2d 620
(1985). The court finds that Reale's conduct was wilful. He consented to the Order under which he was prohibited from transferring any assets. His explanation for the transfer — that if he did not transfer the shares to his daughter, then someone else would transfer them — was incredible to the point of perjury. Reale flagrantly disobeyed this Court's order and then lied about the nature of the transfer. The court, therefore, finds Antonio Reale in civil contempt.
Sanctions for civil contempt may be either a fine or imprisonment; a fine may be remedial or it may be the means of coercing compliance with the court's order and compensating the complainant for losses sustained. The fine imposed for a civil contempt may be payable to the complainant CT Page 8203-dv as compensation for his loss. Dunham v. Dunham, 217 Conn. 24, 28 n. 3,584 A.2d 445 (1991). Since Reale has stated that the shares he transferred to his daughter have a value of $440,000 the court imposes a fine on Mr. Reale in the amount of $440,000 payable to the plaintiff to compensate the plaintiff for the loss of assets which would have been otherwise available to satisfy the plaintiff's judgment and orders that that amount shall be paid to the plaintiff's attorney within 21 days of the date this decision is filed. Failure to pay that amount will result in an order that Mr. Reale be taken into custody of the State of Connecticut until that amount is paid.
By the court,
Aurigemma, J.